362 So.2d 1082 (1978)
STATE of Louisiana
v.
Charles Ray JACKSON.
No. 61606.
Supreme Court of Louisiana.
September 5, 1978.
Rehearing Denied October 5, 1978.
*1084 Marion B. Farmer, Covington, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Woodrow W. Erwin, Dist. Atty., Julian J. Rodrigue, Kurt F. Sins, Asst. Dist. Attys., Abbott J. Reeves, Director, Research and Appeals Div., Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Defendant Charles Ray Jackson was charged in a grand jury indictment with simple burglary of the residence of Cyrus Plummer on September 26, 1976. He was found guilty in a jury trial, multiple billed, found guilty as an habitual offender and sentenced to imprisonment at hard labor for twelve years. Seven assignments of error are relied upon by the defendant on this appeal.
Assignment 1 The State notified defendant pursuant to Article 768 of the Code of Criminal Procedure that it intended to use in evidence the confessions made by Jackson on October 4, 1976. Defense counsel then filed a motion to suppress this confession.
At the hearing held on the motion to suppress testimony was adduced. From this evidence it was ascertained that Deputies Benjamin White and Bryan Sanders of the St. Tammany Parish Sheriff's Office, received information that a burglary had been committed at a service station in Madisonville on the night of October 3, 1976. Jackson and Robert Richardson were seen in Madisonville that night by Officer John Passero, patrolman for the Madisonville Police. In an effort to obtain additional information relating to that burglary White, Sanders and Passero drove to the residence of Robert Richardson on 31st Avenue in the city of Covington at 12 o'clock noon the following day.
At the 31st Avenue residence they inquired of Richardson whether Jackson was there. Jackson was inside the house at the time, and while the deputies waited outside to speak to him, a number of people gathered around. When Jackson appeared, they asked if he was in Madisonville the night before. Jackson said that he was, and he named the people he was with at the time. Finding that further private, uninterrupted conversation would be impracticable in the presence of the curious who had gathered, the officers asked Jackson "if he would mind" coming to the sheriff's office to talk to them. Jackson agreed and he and Richardson drove to the sheriff's office with the deputies in their car.
Upon arrival they entered the office in the Sheriff's Annex of the Courthouse where other officers were at work. After *1085 preliminary questioning Richardson departed. At that time when Deputy Sanders questioned Jackson he advised him of his rights. While talking to Jackson and to other officers, and by comparing reports of other burglaries, they determined that some of the ill-fitting clothes Jackson was wearing appeared not to be his and had probably been stolen in a burglary of Althea Davis' residence.
Jackson was then taken into the adjoining interrogation room by Deputies White and Sanders. Officer Davis, who was the son of the burglary victim, was called and asked if he could identify the clothing of his brother, taken from his mother's house. He could not, but summoned his brother who identified the clothing as his, taken during the burglary. With this informationthe first real evidence implicating Jacksonthe officers placed him under arrest and advised him of his rights. After he signed the printed waiver of rights form, Jackson was questioned and gave a statement, which was recorded and later transcribed. In that confession, shortly after two o'clock, he set forth the details of the burglary at the Davis residence and declared that the statement was made of his own free will without having been influenced in any way by fear, threats, drugs, promises or rewards. Jackson was then booked and jailed at 4:20 that afternoon.
In the meantime, after the confession had been recorded, and before the controverted confession later made relating to the burglary in this case, investigations were conducted relating to burglaries in Covington at the Keifer and Plummer residences which implicated Jackson. During this time he was taken to the Covington City Police Station, where he admitted to the city police that he had been advised of his rights and where he was again questioned. At that time Jackson confessed orally to those burglaries. At his request the city police telephoned Richardson in an effort to locate someone who would sign Jackson's bail bond.
Then, about 5:30, the officers returned with Jackson to the interrogation room in the Sheriff's Annex where they again advised him of his Miranda rights and questioned him about what appeared to be a very expensive wrist watch he was wearing, which they had observed while he was being questioned about the Davis burglary. Jackson was unable to say where he got the watch or to state its value. For this reason the officers again reviewed the reports of recent burglaries in the adjoining office. They found that a watch was referred to in a report of a burglary at the residence of Cyrus Plummer, which matched the description of the watch being worn by Jackson. With this information they concluded that Jackson was possibly implicated in the Plummer burglary. Deputy White therefore resumed the interrogation with the help of a city policeman who was assisting in the case. Previous inspection of the watch had revealed that Plummer's initials were inscribed on the back. Plummer had been called and had identified the watch as the one stolen during the burglary of his residence.
Faced with this damaging evidence, Jackson confessed to the Plummer burglary in the presence of Deputies White and Sanders, declaring, "I was walking down the track and I turned off in his yard. I took out the screen and raised the window up and crawled in through the window." A pistol, the gold watch, and small change were taken. After the Plummer statement was taped, Jackson was booked and jailed. It was then after ten o'clock.
All officers involved in conversation with Jackson during this time testified categorically that he was not intimidated, beaten or threatened. Also, until he was arrested for the Davis burglary he was free at all times to leave. He was not handcuffed or otherwise restrained.
In an effort to overcome the foregoing State evidence, the defense called Hampton A. Porter to the stand. He was then a prisoner in the St. Tammany Parish jail, convicted of armed robbery and sentenced to 99 years, awaiting the results of his appeal. Porter testified that when Jackson returned to jail that night after ten o'clock *1086 he was bent over and complaining that he was hurt. Porter observed bruises on his rib cage and that he was urinating blood.
Another inmate of the parish prison, Johnny Richardson, who was serving time for burglary, testified for the defense. He heard Jackson complain that he had been beaten and saw him urinating blood. The litany was repeated by a third prisoner, Jerome Hall. He saw Jackson the night of October 4, 1976 and the next day. Jackson, he testified, was cramped over, his ribs were bruised and blood was observed in the toilet after it was used by Jackson. All of these witnesses advised Jackson to see a doctor. However, no evidence supports a finding that any of them or Jackson either sought or obtained medical attention. And the jail cards prepared at the time a prisoner is admitted indicated that Jackson made no complaint that he was hurt. If he had, the procedure would require that he be transported to a doctor immediately.
Jackson's testimony was to the effect that he was choked, beaten, struck in the face, struck on the head by his tormentors' knuckles and hit on the knees with a pipe. Five of the officers who were present at one time or another during the investigation, Davis, Primus, Meiners, White and Sanders, are accused of using this force to compel the two confessions Jackson gave on October 4.
However, the State rebutted each and every one of defendant's allegations with specific contrary testimony from the officers involved in the investigation. In doing so the State met the burden of rebutting the specific testimony introduced on behalf of the defendant concerning the charges that coercive measures or intimidation had been employed. State v. Hills, 354 So.2d 186 (La.1977); State v. Simmons, 328 So.2d 149 (La.1976).
As the habitual offender charge indicated, in addition to the two burglaries to which he confessed on October 4, 1976, Jackson had previously been convicted of theft of an automobile on the 11th of July 1974; simple burglary on October 14, 1974; and theft of an automobile valued at between $100 and $500 on May 30, 1974. He was therefore knowledgeable concerning interrogation, arrest and jails. His "worldliness" and previous experience with police procedure undoubtedly had a substantial bearing upon the credibility of his testimony. Credibility of his prisoner-witnesses was subject to the same circumspection.
After hearing the witnesses the trial judge decided that the State had sustained the burden of proof and that the confessions were free and voluntary. Accordingly, he denied the motion to suppress and the defense assigned the ruling as error.
Undoubtedly the credibility of the witnesses was an important factor in the judge's decision. On appeal great weight should be accorded a determination by the trial judge based upon the credibility of witnesses. For, as this Court has recognized, the voluntariness of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to voluntariness will not be overturned unless they are not supported by the evidence. State v. Hutto, 349 So.2d 318 (La.1977).
Taking these principles into consideration, the crucial issue of this case involves whether Jackson was in custody or detained while being questioned before he was advised of his Miranda rights. The interval of time in question began when the officers first contacted Jackson at the Richardson residence and ended when he was given his first Miranda warning by Deputy Sanders in the office of the Sheriff's Annex, prior to the formal interrogation which ensued thereafter in the small interrogation room. The only significant questions during that period were asked when Jackson was at the Richardson residence where he was asked if he was in Madisonville the night before and those relating to his ill-fitting clothes in the office after arrival at the Annex. For thereafter, the Miranda warnings were repeated and Jackson confessed.
Jackson was not compelled to go with the officers, he was asked if he would "mind" going. He responded that he did not and *1087 joined the officers voluntarily. At no time was he restrained, handcuffed or ordered to remain at the "office" until he was arrested. Prior to that time he was free to go and if he had asked would have been allowed to do so. Not until his arrest was his questioning under detention or custody. For, under these facts and circumstances, the custody and detention contemplated by the law had not yet developed to the extent that a Miranda warning was required until his arrest, although the testimony of Deputy Sanders is to the effect that a Miranda warning was given before any questioning at the office. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and La.Const. art. I, § 13.
With due regard to the finding of the trial judge, and on the basis of this Court's independent review of the record, the motion to suppress was properly denied.
Assignment 2 While Deputy White was testifying on direct examination, he stated that the Plummer confession was given shortly after Jackson confessed to the Davis burglary, and it was not yet dark when Jackson confessed to the Plummer burglary. This was obviously inaccurate because the transcribed version of the Plummer confession showed that it was recorded at 10:15 on the night of October 4.
In an effort to rehabilitate his witness, the prosecutor pointed out that the hearing on the motion to suppress was being held five months after the confessions were given and that the happenings surrounding the confession must have required more time, indicating that the witness was in error about the time of the Plummer confession.
Defense counsel objected that the prosecutor was leading the witness and attempting to impeach him. The trial judge overruled the objection and this assignment claims error in the ruling.
As this interrogation is viewed it is not strictly speaking an effort by the State to impeach its witness. It is more properly an attempt to clarify an obvious discrepancy in the witnesses' testimony arising from a fault of memory due to the passage of time. The witness White had dictated the time of the confession into the recorder as 10:15 o'clock on the night of October 4. His statement that the confession was complete before dark was error, creating a situation which required explanation. Getting White to admit that he was in error was a matter which concerned the weight of his testimony. The questioning only emphasized what was already apparent from the record.
While it is not proper to impeach one's own witness, it is permissible to clarify a basis of misunderstanding. State v. Weems, 358 So.2d 285 (La.1978). Furthermore, defense counsel was given wide latitude in cross-examining the witness on this alleged attempt by the State to rehabilitate, a fact which dispels any claim of undue prejudice in this hearing before the judge alone. State v. Sneed, 328 So.2d 126 (La. 1976). This assignment is without merit.
Assignment 3Violations of the sequestration rule are claimed by the defense in connection with the testimony of several State witnesses. Before ruling on defense objections to the testimony of witnesses who had violated the rule of sequestration, the trial judge required that the witnesses involved be interrogated under oath to determine whether their transgression had any prejudicial effect. In no instance was it disclosed that the technical violations were willful or harmful to the defendant. Satisfied that this was the case, the trial judge overruled the objections and permitted the witnesses to testify.
Sequestration is designed to prevent the influencing of witnesses by testimony of prior witnesses and to strengthen the role of cross-examination in developing the facts. State v. Mullins, 353 So.2d 243 (La.1977). Article 764 of the Code of Criminal Procedure permits the court to modify its order in the interest of justice, a broad authorization vesting much discretion in the trial judge. A review of this record discloses no undue influence resulted to the witnesses in question from violation of the rule. There was, therefore, no abuse of discretion in the ruling of the trial judge.
*1088 Assignment 4It is contended that the trial judge erroneously permitted the prosecutor to ask Cyrus Plummer, the victim of the robbery, if he had given Jackson permission to go into his residence. Such a question implied that Jackson had in fact entered Plummer's house, the defense argues, requiring that Jackson prove that he did not. The question was therefore prejudicial and impermissible.
Such a question was relevant to prove that Jackson entered Plummer's house without the owner's authorization, an essential element of the crime which the State was required to prove. La.Rev.Stat. 14:62. The question was therefore proper and the testimony to the effect that Plummer had not given his consent to Jackson's entry was admissible.
Assignments 5 and 6Contentions are made that finding defendant to be a second offender under the Habitual Offender Law was invalid because the finding was based upon a previous guilty plea to a charge of burglary in Rapides Parish. Invalidity is claimed because in accepting the guilty plea the trial judge allegedly failed to define the crime of burglary, failed to advise defendant that his guilty plea could be used against him in a future multiple offender charge, the record did not show that defendant waived the delays for sentencing, and the Habitual Offender Law was being applied selectively against defendant because in the instant case he elected to stand trial instead of pleading guilty.
At the sentencing in Rapides Parish Jackson and Anthony Cheneau, who were jointly charged, were each represented by counsel. With respect to the contention that the burglary statute was not read to Jackson, the trial judge did ask him if his attorney had explained to him the law that he was accused of violating and the consequences of a guilty plea, to which Jackson responded that he had been so advised.
In addition to the extensive advice the trial judge gave Jackson concerning the rights he was waiving by a guilty plea, he advised him that his parole or probation could be revoked and the sentence resulting from his guilty plea could be added to any sentence he was required to serve as a result of a parole or probation revocation. While such advice did not precisely pertain to use of the guilty plea conviction in a future multiple offender charge, it did alert the accused to the fact that the conviction could have effect in the future.
The delays for sentencing under the specific language of Article 873 of the Code of Criminal Procedure do not apply to pleas of guilty in which case sentence may be imposed immediately.
There is no evidence in this record to support the contention that the Habitual Offender Law was applied selectively to Jackson.
Although there was no explicit reading of the statute on burglary, the effect of the proceeding was to accomplish the same result. Jackson had been advised of the law by his attorney and stated that he was in fact guilty of the charge under that law. And no authority has been cited which required the trial judge to advise Jackson that the conviction resulting from a guilty plea could be used in a future multiple offender charge.
Courts have held that failure to advise of collateral, but foreseeable, adverse consequences of a guilty plea does not permit the withdrawal of the guilty plea. Nor is the trial judge required to anticipate all of the peripheral consequences which may affect the defendant in the future as a result of a guilty plea. State ex rel. LeBlanc v. Henderson, 261 La. 315, 259 So.2d 557 (1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101; State ex rel. McChesney v. Henderson, 260 La. 1196, 258 So.2d 550 (1972), 482 F.2d 1101 (5 Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102.
In all other respects the advice given to Jackson at the time of sentencing was abundant and thorough. He was well aware of the charges to which he was pleading and the consequence of his plea. This assignment has no merit.
*1089 Assignment 7In a prayer for oyer in advance of trial defendant asked for a list of all State witnesses, including their addresses. The State replied that they were not required to furnish this information and the trial judge agreed.
No statute or jurisprudence requires that the State furnish a list of its witnesses to the defense.
For the reasons assigned, the conviction and sentence are affirmed.
CALOGERO and DENNIS, JJ., concur.