STATE of Missouri, Plaintiff/Respondent,

v.

Janet K. BOHN, Defendant/Appellant.

No. 70444.

Missouri Court of Appeals,
Eastern District,
Southern Division.

Aug. 5, 1997.

Stephen C. Wilson, Scott A. Lipke, Jackson, for defendant/appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Theodore A. Bruce, Asst. Attys. Gen., Jefferson City, for plaintiff/respondent.

GRIMM, Judge.

A jury found defendant guilty of first degree murder and armed criminal action, both Class A felonies, sections 565.020 and 571.015, RSMo 1994. The trial court sentenced defendant to life imprisonment without eligibility for probation or parole for the murder and ten years for armed criminal action, consecutively.

Defendant raises three points; her first is controlling. In that point, she alleges the trial court erred in overruling her motion to suppress (a) statements she made during a custodial interrogation, (b) statements obtained from another witness, and (c) a gun as evidence. She contends her statement was obtained after she invoked her right to have an attorney present and the other statement and gun were "derived directly from the illegal questioning of defendant." We agree that the statement obtained from defendant violated her rights and reverse and remand.

## I. Background

On December 31, 1993, defendant shot her husband in the head, killing him. His body was found the next morning and later that day Highway Patrol officers questioned defendant about the death.

Over the next week, defendant and the officers had several conversations. On January 12, two of the officers, Sergeants Conway and Crump, interviewed defendant at her attorney's office for approximately six hours. At the conclusion of the meeting, the attorney "told them that if they needed anything further they should go through" her.

The attorney contacted the officers the next day. At that time, the attorney informed the officers that defendant was not willing to take a polygraph test but would provide requested phone records. That was the last contact the attorney had with the officers regarding defendant.

On February 2, these officers went to defendant's home to discuss harassing phone calls she had received. During this conversation, the officers initiated a discussion regarding a polygraph examination. They convinced her to take the test and agreed to pick her up at her home the next morning.

On February 3, Conway picked defendant up at her home in Ste. Genevieve a little after 9:00 a.m. He took her to a satellite patrol office at Park Hills for the polygraph examination. Before meeting with the examiner, one of the officers told the examiner that defendant had an attorney and they had met with the attorney. The examiner read her the Miranda warnings shortly after 10:00 a.m. The polygraph examination consists of three parts, a pre-test, an in-test, and a post-test. During the pre-test portion, defendant got upset, left the building, and went across the highway.

Conway and Crump went after her. They talked her into returning and resuming the examination. Upon her return, the examiner conducted the in-test part of the examination. Upon its completion, the examiner left the room and discussed the results with Conway

and Crump. Among other things, he told them that he believed the gun was in a river.

The examiner then returned to the examination room. He told defendant that he interpreted the results to show that she was being deceptive. At the suppression hearing he testified, "that's when she requested that she didn't want to say anything else unless she had an attorney." Defense counsel asked the examiner, "It was clear to you she didn't want to talk anymore until she had a lawyer; fair?" He responded, "Yes. sir."

The examiner ceased the interrogation and left the room. He went down a hallway and talked to Crump. At the hearing on the motion to reconsider the motion to suppress, the examiner recalled asking Crump, "what are we going to do now?" He remembered someone saying, "it was too important of a case to let her walk out." Further, "some inference was made to the predicament that I believed that she had requested legal counsel."

Crump did not testify at the hearing on the motion to reconsider. However, at the original hearing, on the motion to suppress, he acknowledged that the examiner talked to him. According to Crump, the examiner "said something to me to the effect, she asked for an attorney, or, we have an attorney problem, or something along those lines."

The polygraph examination was video and audio taped. The tapes also picked up some of the conversation between the examiner and Crump. They reflect that the examiner said to Crump, "we're kind of treading on thin ice now that she's asked for an attorney." Crump responded, "Oh, f—— her. I'll burn these tapes. We ain't got nothing anyhow … I didn't hear her ask for one."

Crump said that his statement "did not mean that [he] would destroy evidence." He was then asked, "Did it mean that you intended to pursue the interview further, even though she asked for a lawyer?" He responded, "That would certainly indicate that that's what that meant. I don't have an independent recollection now of that statement." "I would say I was probably emotionally charged at that time, and the conversation that transpired between myself and [the examiner] just simply didn't register with me."

As the examiner left the examination room to talk to Crump, defendant got up and started to leave the room. Conway, who had been in the hall outside, asked her to go back in the room and started talking to her. He was afraid that defendant was going to discontinue the interview.

A few moments later, after talking with the examiner, Crump entered the room. He did not tell Conway that the examiner had told him defendant asked for an attorney. Together they interviewed defendant for over an hour, concluding about 5:15 p.m. Neither of them advised defendant of her right to have an attorney, nor did they secure her waiver of that right during this interview.

During this time, defendant admitted shooting her husband. She also told them where she had thrown the gun and went with them to the bridge where she had thrown the gun. Previous to these statements, defendant had not told any law enforcement officer that she had shot her husband, nor had she said where the gun could be found.

That same evening, a Ste. Genevieve police officer picked up the alibi witness and took her to the patrol's satellite office in Park Hills. En route, the officer told her that defendant had confessed. At the satellite office, the examiner interviewed her from around 7:15 p.m. until 10:30 p.m. During that time, she told the examiner that she and defendant had stopped on a bridge and that defendant tossed something off the bridge.

Also that evening, Crump called the Ste. Genevieve County prosecuting attorney. Conway overheard Crump's portion of the conversation. Crump told the prosecuting attorney that defendant had confessed "and that it was our belief, based on what [the examiner] had said, that she had asked for an attorney prior to her confession." The prosecuting attorney's record of that conversation contains the notation, "[defendant] asked for a lawyer before confessing."

On February 5, the alibi witness went with law enforcement officers to a bridge. This

bridge was where defendant disposed of the gun. There, the alibi witness threw a rock into the river in the approximate location where defendant had thrown the gun. The officers then recovered the gun. Defendant was charged with murder and armed criminal action. Thereafter, she filed motions to suppress her confession and all evidence obtained because of the confession, which the trial court granted. Thereafter, the state filed a motion for reconsideration, which the trial court granted. Following another hearing on the motions to suppress, the trial court overruled them.

## II. Motion to Suppress

This court's review of a ruling on a motion to suppress evidence is based upon the whole record and the totality of the circumstances, and we will affirm if the ruling is supported by substantial evidence. *State v. Brown*, 762 S.W.2d 471, 474 (Mo.App. E.D. 1988). If there is sufficient evidence to support the trial court's ruling, "we must disregard contrary evidence or inferences." *State v. Woods*, 861 S.W.2d 326, 332 (Mo.App. S.D. 1993).

### A. Confession

We first examine that portion of defendant's first point where she alleges trial court error in not suppressing the incriminating statements she made after she requested an attorney.

The United States Supreme Court spelled out the general rule concerning use of statements obtained from a defendant. It summarized its holding in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966) by saying:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

In the case before us, two highway patrol officers convinced defendant to take a polygraph examination. An officer picked her up in Ste. Genevieve a little after 9:00 a.m. and took her to a patrol satellite station in Park Hills. The examination began around 10:15 a.m., however defendant became angry and left the station. Two officers went after her and talked her into returning to the station.

The examiner continued the polygraph examination and began discussing the results with defendant. During that discussion, around 4:00 p.m., the examiner determined that defendant wanted an attorney and he terminated his discussion and questioning.

The state does not contest defendant's allegation that she was in custody when she gave her statements to Crump and Conway. Clearly, they initiated the questioning at a time when they deprived her of her freedom of action in a significant way.

Rather, the state argues that the trial court did not err in overruling the motion to suppress. It contends defendant "failed to express unequivocally her desire to rely upon her right to counsel prior to her confession," relying on *Davis v. U.S.*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

In *Davis*, the defendant waived his rights to remain silent and to counsel. An hour and a half into an interview, the defendant said, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455, 114 S.Ct. at 2353. The interviewer asked the defendant if he was asking for a lawyer or just making a comment about a lawyer. The defendant replied, "No, I'm not asking for a lawyer, ... No, I don't want a lawyer." *Id.*

The state focuses on that part of *Davis* where the Supreme Court discusses whether an accused actually invoked the right to counsel. It emphasizes the Court's statement that "an objective inquiry" is made and "the suspect must unambiguously request counsel." *Id.* at 459, 114 S.Ct. at 2355.

However, that emphasis overlooks the next paragraph of the *Davis* opinion. There, the Court continued saying that a suspect need not "speak with the discrimination of an Oxford don." *Id.* Rather, the suspect "must articulate his desire to have counsel present

sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

In the case before us, the examiner was a fourteen year veteran of the highway patrol. Before beginning his interview of defendant, he knew that she had consulted an attorney. Following the in-test portion of the polygraph examination, the examiner told her he interpreted the results to show that she was being deceptive. Following some discussion, the examiner said, "Why don't you just talk to the investigators now? I mean, I'm sure they'd be willing to talk to you." Defendant replied, "I'm sure they would, too, but I feel like I ought to have a good counselor. I have in the past." The examiner responded, "Yeah, you're entitled to legal counsel."

The examiner testified that he "interpreted the word 'counselor' to mean that she wanted to have an attorney." Further, he said that "the context of the conversation led me to believe that she wanted an attorney, and I felt obligated to cease the interrogation." That context could include the knowledge he had that she had an attorney and that she had previously talked with the investigators in her attorney's presence.

Here, defendant's request for an attorney was sufficiently clear that the only person she was talking to, the examiner, immediately understood her statement to mean that she wanted an attorney. In his mind, the request was clear and unequivocal, for he terminated the interview. Nothing in *Davis* suggests that if an officer understands a statement to be a clear and unequivocal request for an attorney, and ceases the interrogation, that at a later time, the state can dissect and challenge the statement and establish that it was not clear and unequivocal.

Nevertheless, the state contends that four Missouri cases support its position that the request here was insufficient. None are applicable. In *State v. Moore,* 744 S.W.2d 479 (Mo.App. S.D.1988), the defendant commented that "maybe he should have an attorney." *Id.* at 480. The investigating officer told the defendant he could not advise him one way or the other. The defendant then said, "Okay, no games" and proceeded to

give a statement. *Id.* The trial court's denial of the motion to suppress was affirmed.

In *State v. Wilkinson,* 861 S.W.2d 746 (Mo.App. S.D.1993), prior to his confession, the defendant asked, "Could I call my lawyer?" The deputy sheriff replied, "Yes." Defendant did not do so, nor did the record contain any other evidence of a request for a lawyer. *Id.* at 748. The trial court's denial of the motion to suppress was affirmed.

In *State v. McVay,* 852 S.W.2d 408 (Mo. App. E.D.1993), the defendant's motion to suppress apparently involved two statements allegedly invoking the right to counsel. The first was a "request to speak to his wife." The second was "that he could not afford a lawyer." *Id.* at 413. This court concluded that neither statement constituted a request for counsel and affirmed. *Id.* at 413–14, 417.

The fourth case the state relies on is *State v. Cooks,* 861 S.W.2d 769 (Mo.App. E.D. 1993). In that case, the defendant signed the *Miranda* Warning & Waiver form in *two* places instead of one. *Id.* at 771. One signature was on the appropriate line to waive rights, the other was on the line to invoke rights. He argued the two signatures constituted a request for counsel. *Id.*

However, the defendant testified that he signed the form without reading it. Therefore, this court disregarded "whatever cogency the form may have had on the issue of waiver or invocation." *Id.* Defendant never verbally indicated that he wanted an attorney and the trial court's denial of the motion to suppress was affirmed.

The factual differences in those four cases from the one before us are obvious. In none of them did the officer who heard the defendant's statement conclude from the statement that the defendant wanted an attorney. In contrast, here the examiner knew, from the words and their context, that defendant was invoking her right to counsel. Further, the examiner ceased the interrogation and left the room. Also, defendant got up out of her chair and started to leave the room before she was intercepted by Conway and asked to return to the room.

Next, the state contends that even if defendant's request was sufficient, defendant's questioning of the examiner "clearly shows an initiation of further statements by" defendant. The state argues that such initiation permitted the officers to continue questioning defendant.

The record does not support the state's contention. Rather it shows that after defendant's request for an attorney, the examiner said, "Yeah, you are entitled to legal counsel." Defendant then commented, "I haven't eaten all day." At this point, the examiner, rather than defendant, initiated further conversation, saying:

> The only thing I suggest, I mean this is only a suggestion, I mean like person to person. When you talk with your counselor, if you have not been 100% truthful with me, when you sit down and talk with her this time, be a 100% truthful with her so that she knows how to best help you, okay? ... 80% of the truth going on ... there is no way that they can defend you or help you out a hundred percent. You have assured me that you have been 100% truthful with your attorney when you talked to her about this?

Thus, the record discloses that the examiner, rather than defendant, initiated the conversations. Further, when the examiner and defendant started to leave the room, it was Conway who stopped her, asked her to return to the room, and began the conversation with her.

The totality of the circumstances support our conclusion that the trial court erred in not suppressing defendant's confession. First, the examiner and the two officers knew that defendant had an attorney. Second, during the interview, defendant said that she "ought to have a good counselor" as she had in the past. Third, the examiner had no doubt, from the words and their context, that she was asking for an attorney. He told Crump that she asked for an attorney, who ignored her request. Fourth, defendant attempted to leave the room once the examiner left. Fifth, defendant was unable to leave because Conway blocked her path and asked her to have a seat. Sixth, thereafter, Conway initiated further interrogation of defen-

dant. This part of defendant's first point is granted.

## B. Alibi Witness's Statements

■ In the next portion of defendant's first point, she alleges the trial court erred in not suppressing the alibi witness's incriminating statements. She contends they "were the direct and proximate result of the illegal questioning of [defendant] and would not have been inevitably obtained."

■ The general rule is that the exclusionary prohibition for violating a Fourth Amendment right applies to the direct and indirect products of such invasions. *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537, 545 (1980). However, if the state can show "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387–88 (1984).

In the case before us, after defendant confessed, a Ste. Genevieve police officer picked up the alibi witness and took her to the satellite office. En route, he told her that defendant had confessed. After arriving at the satellite office, she gave a statement, implicating defendant in the murder.

The state argues that the statements would have been inevitably obtained and therefore should not be suppressed. It points out that the alibi witness's identity was known early on. On January 7, just seven days after the murder, Conway interviewed the witness. She told him that during the evening of December 31, 1993, she and defendant went to Festus shopping. They ate at a restaurant there, and then continued shopping. When they returned to defendant's home, they dropped off their packages. Then, defendant, the alibi witness, and the witness's husband spent the rest of the evening at a tavern.

As the investigation of the murder continued, the officers found inconsistencies in the statements given by defendant and the alibi witness. The officers discussed the possibility of having each of them submit to a poly-

graph examination. Defendant was examined first because she agreed to take the examination.

At the hearing on the motion to reconsider the motion to suppress, the alibi witness testified. She said she had been worried prior to being picked up on February 3. She had discussed her concerns with defendant and if the officers had picked her up at any time and questioned her, she "probably would have told" them the truth. Further, she said that if they had told her the gun was in the water, she would have confessed. Moreover, she said that the truth "was going to come out" for "peace of mind."

The trial court inquired of the witness, "Why do you believe you would have come forward regardless? You hadn't up to that time, had you?" The witness replied, "I would have eventually come out with the truth ... My conscious [sic] would have bothered me. I would have eventually."

Later, the trial court inquired further. It asked if the examiner would "have been able to persuade you with just normal questioning" to confess. She answered, "I believe he probably would have; yes ... I was thinking the same thing, you know. It's time to come out with the truth."

The record demonstrates the alibi witness's willingness to testify. Further, her identity was known early in the investigation, and the officers intended to interrogate her further. The state made an adequate showing that the alibi witness's testimony would have ultimately been discovered by lawful means. Thus, under the holding of *Nix*, the trial court did not err in overruling the motion to suppress the alibi witness's testimony.

### C. Gun

 In the final portion of defendant's first point, she alleges the trial court erred in not suppressing the gun. She contends "the discovery of the [gun] was the direct and proximate result of the illegal questioning of [defendant], the subsequent interrogation of [the alibi witness], and would not have been inevitably obtained."

Before defendant's confession, the polygraph examiner concluded that defendant had failed the examination. He also believed that, based on her responses to questions concerning the gun's location, that it was in a river. He told Crump and Conway of his beliefs and suggested that they needed to pick up the alibi witness and talk to her immediately.

At the hearing on the motion to reconsider the motion to suppress, the prosecutor asked the alibi witness, "What if [the officers] would have told you that the gun is in the water. What would you have done?" She responded: "I would have confessed." Ultimately, it was this witness's information, not defendant's, that led to the actual discovery of the gun.

The trial court did not err in overruling this portion of the motion to suppress. The evidence supports a finding that the gun would have been inevitably discovered despite the defendant's confession.

### III. Other Points

Defendant raises two additional points. One concerns the trial court's refusal to permit Sgt. Crump and the polygraph examiner to testify about any discipline they may have received as a result of their actions in this case. The other concerns the trial court's refusal to grant a mistrial for comments made during closing arguments.

We have examined the record and find that the trial court's rulings do not constitute an abuse of discretion. No jurisprudential purpose would be served by a written opinion on those two points. Rule 30.25(b). Both points are denied.

The trial court's judgment is reversed, and the cause remanded for a new trial.

CRAHAN, C.J., and GERALD M. SMITH, P.J., concur.