607 S.E.2d 498

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**James Reginald JONES, II, Defendant Below, Appellant.**

No. 31590.

Supreme Court of Appeals of West Virginia.

Submitted April 13, 2004.

Decided Dec. 3, 2004.

Darrell V. McGraw, Jr., Attorney General, Jon R. Blevins, Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

Gloria M. Stephens, Esq., Welch, West Virginia, for Appellant.

**PER CURIAM:**

In the instant case, we reverse a conviction for two counts of second degree murder because evidence was admitted at trial that was obtained in violation of the defendant's constitutional rights to counsel and silence.

## I.

On August 30, 2002, the appellant, James Jones, was convicted in the Circuit Court of McDowell County of two counts of second degree murder, and sentenced to forty years' imprisonment on each count. He was acquitted on two charges of first degree murder and on charges of robbery, burglary, and conspiracy.

The charges arose from an incident in 2001 when John and Kim Stepp, husband and wife, were shot to death in their mobile home in the presence of their young child by Keith Molineaux, then age 27. The appellant, who was then age 16, and two adults, Brandon Britto and Thomas King, had accompanied Keith Molineaux to the Stepps' mobile home. The Stepps purportedly owed Keith Molineaux money as a result of drug sales.

Shortly after the shooting, King entered into a plea agreement and testified in separate trials against Molineaux, Britto, and the appellant. King pled guilty to burglary.

Britto, the owner of the murder weapon, was acquitted at his trial. Molineaux was convicted of two counts each of first degree murder, burglary, and conspiracy and received two life without mercy sentences.

The appellant was transferred to the circuit court's adult jurisdiction and stood trial. At the appellant's trial, King testified as follows:

Q. When is it that you went into the living room?

A. After Keith told us to search the house.

\* \* \* \* \* \*

Q. And why is it that you—the three of you did that?

A. Because Keith starting (sic) aiming the gun and told us to search.

Q. He was aiming the gun at you?

A. Yes.

Q. And Britto and Jamie?

A. Yes.

\* \* \* \* \* \*

Q. You were totally shocked when Keith pulled the gun; is that correct?

A. Yes.

Q. And did you see the reaction of Jamie when Keith pulled the gun?

A. He was—he was surprised. He didn't know what was going on.

Q. You could tell he didn't know what was going on either?

A. Yes.

Q. At the time you were at the Stepps, did you ever hear Jamie say to the Stepps "give me your money"?

A. No.

Q. But you did hear Keith demand money from the Stepps, didn't you?

A. Yes.

Q. And prior to Keith pulling the gun and demanding money from the Stepps after entering their house, there had been absolutely no discussion of going there to rob them; isn't that correct?

A. Yes.

Q. ... all of the times that Jamie was with Keith in that two-day period, you were there also; isn't that correct?

A. Yes.

\* \* \* \* \* \*

Q. Would it be fair to say—from your observation, watching what Keith was doing, would it be fair to say that he was out of control?

A. Yes.

\* \* \* \* \* \*

Q. It is correct that Jamie did what Keith told him to do; isn't that correct?

A. Yes.

Q. And that's while having a gun pointed at him; isn't that correct?

A. Yes.

At trial, the principal evidence tending to support the charge that the appellant had knowledge of and had a shared purpose to commit a crime at the Stepps' mobile home came in the form of testimony from a police officer who participated in an interrogation of the appellant following the completion of a polygraph test of the appellant on February 8, 2002.

The polygraph test, in which the appellant answered ten questions asked by a police officer while the appellant's bodily state was being monitored and recorded by instruments, was administered at the appellant's request—as part of his effort to persuade the police that he was not criminally responsible for the Stepps' death.

The appellant's counsel accompanied the appellant to the State Police office and asked to be present at the polygraph test—but the appellant's counsel was advised by the police that she could not be in the testing room during the test. The appellant executed a waiver of his right to remain silent, indicating that he would voluntarily participate in a polygraph examination; because the appellant was a juvenile, his counsel also signed a form agreeing to the examination. The waiver forms did not mention any post-test interrogation. The attorney waited outside the testing room for a while; then she left, leaving her phone number with the police.

After the test was completed (about 20 minutes), the police officer confronted the appellant with the accusation that the appellant's bodily responses to questioning indicated deception. Then the officer proceeded to further question the appellant, who was no longer monitored by the polygraph equipment. When the post-test confrontation and questioning began, the appellant asked to speak to his lawyer. The appellant was told that she had gone and had left her phone number. The officer testified at a pre-trial suppression hearing that when the appellant was asked if he wanted to call his attorney on the phone, the appellant stated: "No, let's continue." The post-test interrogation then continued for more than one hour.

During the same pre-trial hearing, the officer was asked whether, prior to the appellant's executing the written pre-test waiver, "either counsel or the appellant were aware that an interrogation would proceed after the actual polygraph test?" The officer replied, "You didn't ask. I mean, it wasn't asked. I would assume that you know that from practicing law."[1]

At the appellant's trial, the officer testified over defense objection that during the post-test interrogation, the appellant said that prior to going to the Stepps' house, the appellant knew that there was reportedly a "contract" out on John Stepp, that the appellant knew that Molineaux had a gun with him, and that the appellant understood that Molineaux intended to hurt or kill John Stepp if Molineaux did not get his money.[2]

It is this evidence that the appellant challenged at trial and upon appeal, on the ground that it was obtained in violation of his rights to remain silent in the face of accusations and questioning and his right to counsel. The circuit court held that the evidence was not obtained in violation of the appellant's constitutional rights.

## II.

■ When addressing claims that evidence should not have been admitted because it was obtained in violation of a defendant's right to counsel and right to remain silent, we review, *de novo*, both questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action that led to the challenged evidence. *State v. Lilly*, 194 W.Va. 595, 600, 461 S.E.2d 101, 106 (1995).

The issue presented by the instant case was recently addressed in *Wood v. State*, 11 P.3d 1249 (Okla.Crim.App.2000). In that case,

> Wood and his counsel agreed to a polygraph examination to be conducted by the O.S.B.I. Wood's counsel accompanied him to the polygraph session but was excluded from the examination room because O.S.B.I. policy prohibited counsel's presence. Counsel waited outside. · After the polygraph examination was concluded, and while counsel was still outside, an O.S.B.I. agent *Mirandized* Wood and then questioned him, successfully obtaining an incriminating statement which was admitted against him at trial. This procedure violated Wood's Sixth Amendment right to counsel and admitting this illegally obtained statement requires reversal.

---

**1.** As we discuss *infra* in Part II, this Court is not aware of anything in the "practice of law" that puts an attorney on constructive or actual notice that the police intend to follow a polygraph test by initiating an interrogation of a defendant who is represented by counsel about the results of the polygraph. As Justice Marshall stated, dissenting in *Wyrick v. Fields*, 459 U.S. 42, 51, n. 2, 103 S.Ct. 394, 398, n. 2, 74 L.Ed.2d 214, 221, n. 2 (1982).

> Certainly no one would argue that a suspect who consented to a blood test, a lineup, or fingerprinting thereby consented to be questioned about the results of those procedures.
>
> In this case, it is particularly inappropriate to assume that Fields must have realized that

the CID agent would conduct a post-examination interrogation. The results of polygraph examinations are inadmissible in Missouri. See *State v. Biddle*, 599 S.W.2d 182, 191 (Mo. 1980) (en banc); *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo.1962). When a defendant, after consultation with his attorney, agrees to submit to an examination the results of which are inadmissible, the authorities have no justification for inferring that the defendant has also agreed to submit to additional questioning that can produce admissible evidence.

**2.** No contemporaneous written or other record of the reported statements by the appellant was made. A "couple of days" later, they were written down by the police officer.

In *Wyrick v. Fields* [459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982)], the defendant agreed to a polygraph examination and attended the exam without counsel. Here counsel was present and was excluded from the session. Wood and his attorney had agreed to a polygraph exam and it follows that anything Wood said during the exam could be used against him. However, nothing in this record indicates that Wood agreed to post-polygraph interrogation without counsel.

FN2. As a general rule, a confession obtained in anticipation of, during, or following a polygraph examination is not inadmissible. *Young v. State*, 1983 OK CR 126, 670 P.2d 591, § 13, 670 P.2d 591, 594.

Additionally, *Brewer v. Williams* [430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)] holds that an individual against whom adversary proceedings have begun has the right to legal representation during governmental interrogations. The State has the burden of proving that the accused knowingly and intentionally relinquished or abandoned that right in order to introduce into evidence incriminating statements made outside the presence of counsel. In *Brewer*, the United States Supreme Court found that the accused did not relinquish his rights to counsel and therefore the incriminating statements were not admissible since they were obtained in violation of the accused's constitutional rights. The Court reasoned that one cannot unintentionally waive one's Sixth Amendment rights to counsel during government interrogation by merely agreeing to limited and specific contact with police outside the presence of counsel, not to questioning conducted during the ride.

Wood agreed to a polygraph exam outside the presence of counsel but not to post-exam interrogation without counsel. Wood's counsel was limited and his counsel should have been present for any questioning following the conclusion of the polygraph exam absent a waiver. The accused and his attorney should execute a waiver of the right to counsel prior to a polygraph exam. For an informed waiver, law enforcement must disclose the complete parameters of the polygraph examination and any statements obtained outside the scope of the waiver are inadmissible. Here, the police exceeded their agreement with Wood and his attorney and Wood's confession is inadmissible.

(Footnotes omitted.)

This issue was also addressed in *United States v. Leon–Delfis*, 203 F.3d 103 (1st Cir. 1999). In that case,

León–Delfis stated that Agent López told him the test would take two to two and one-half hours to complete and his attorney could not be present during the test. León–Delfis' attorney decided to return to his office, and he told Agent López and Agent Narro, who would be observing the testing, that he was available by telephone. Additionally, he told León–Delfis to call him or return to his office immediately after the test was administered.

León–Delfis testified that Agent López asked only eight questions, and the test took only 20 to 25 minutes. León–Delfis thought he was free to leave after the test. However, immediately after the test, while he was still attached to the polygraph, Agent López asked him, "How do you think that you did?" León–Delfis responded, "Well, I think I did well because all I did was tell the truth." Agent López responded, "Look, you flunked the test, so how about telling us the truth." León–Delfis remembered that Agent López immediately began to question hi, joined by Agent Narro shortly thereafter. He felt pressured: the agents told him the United States Attorney would "destroy you in Court in front of your family;" that he was a half-man; that if he was going to cooperate, "it has to be between today or tomorrow," and if he delayed, they might press charges for other crimes. In an interview lasting over an hour that followed, León–Delfis confessed to his participation in the conspiracy.

Agent López testified at the suppression hearing that a typical polygraph test consisted of pre-test questioning to determine suitability for testing and to build rapport between the examiner and the examinee;

the test itself; and post-test questioning to present the results of the test and allow the examinee to explain the results if desired. However, when Agent López was asked on cross-examination whether he informed León–Delfis and León–Delfis' attorney that post-test questioning might occur, he first answered, "I wasn't asked," and then, although not clear, he seemed to testify that he had not explained the post-test questioning procedure. He also acknowledged that post-test questioning was not mentioned in the waivers León–Delfis signed. When asked why he told León–Delfis that the test would take two to two and one-half hours to complete, when in fact the test took less than one-half hour, he answered "That was my estimate." He stated that FBI policy discouraged an attorney's presence during the test, but he denied prohibiting León–Delfis's attorney from attending. Agent López said that after the test was finished, he merely said, "Mr. León, we have a problem. You are not being … completely honest," and that León–Delfis then "started providing explanations."

\* \* \* \* \* \*

After careful review, we cannot accept the district court's holding that León–Delfis waived his right to counsel for purposes of the post-polygraph questioning. The difficulty began when the district court applied the wrong legal standard. The district court stated that "the onus is not on the F.B.I. agent or the government agent" to avoid questioning. However, because León–Delfis' Sixth Amendment right to counsel had clearly attached, the government could not initiate questioning in the absence of counsel without potentially violating that right. Had León–Delfis initiated the post-polygraph discussion, we might reach a different outcome. But he did not. Both he and Agent López testified that the agents began the post-polygraph dialogue. The agents were required to respect León–Delfis' right to counsel by not questioning him in the absence of his attorney.

It is also true that León–Delfis signed two waivers of rights on the day of the interrogation. The district court relied upon these waivers in support of its holding that León–Delfis waived his right to counsel for post-polygraph questioning. However, the district court found that one waiver applied to pre-test questioning, and one to polygraph test questioning. It does not follow that León–Delfis waived his right to counsel for post-test questioning because he waived his right to pre-test and test questioning: waivers of rights are specific.

The waivers León–Delfis signed did not specifically mention the possibility of post-polygraph questioning, and Agent López failed to explain that post-polygraph questioning would occur. All these facts suggest exactly the opposite conclusion than that made by the district court: that León–Delfis having signed two previous waivers did not mean he knowingly and intelligently waived his rights for post-polygraph questioning.

Looking at the totality of the circumstances and specifically focusing on the relevant inquiry articulated by courts referred to above, we hold that the district court erred in concluding that León–Delfis intelligently and knowingly waived his Sixth Amendment right to counsel for the post-test interrogation and that his confession was not admissible.

*Id.* 203 F.3d at 108–112.

The prosecution in the instant case relies on *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982). That case is readily distinguished from the instant case because in *Wyrick* the defendant appeared for a polygraph examination without counsel and affirmatively stated that he did not want counsel present during the polygraph interview with police—even though the police were willing to have counsel present. In the instant case, the appellant came with counsel, who requested being present but was refused. The appellant again requested consultation with counsel, after the polygraph test but before the post-test interrogation.

Moreover, *Wyrick* does not stand for the principle that a knowing, voluntary, and informed waiver of the rights to silence and to counsel prior to taking a polygraph test ex-

tends to post-test interrogation. The correct reading of *Wyrick* is as the Court stated in *United States v. Gillyard,* 726 F.2d 1426 (9th Cir.1984):

> The primary issue therefore is whether as a matter of law the district court was foreclosed by *Wyrick v. Fields, supra,* from finding that the defendant did not freely and voluntarily waive his *Miranda* rights. The government argues that *Wyrick* establishes a *per se* rule that *Miranda* warnings are not required after a polygraph examination when there was a valid waiver prior to the examination. That approach is exactly what the Court in *Wyrick* condemned. *Wyrick* focused on whether or not the Eighth Circuit had misapplied *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and created an unjustified *per se* rule that defendants must always be re-advised of their *Miranda* rights before a post-polygraph interrogation commences. The Court criticized the Eighth Circuit for adopting a *per se* rule, and not examining the totality of the circumstances as *Edwards* requires.[3]

*See also State v. Johnson,* 47 Or.App. 1165, 615 P.2d 1181 (1980) (holding that trial court erred in admitting incriminating statement made by defendant after polygraph examination had ended without requiring state to make a clear showing that admissions were voluntary and that defendant waived his constitutional rights to remain silent and to have counsel present); *Canler v. Commonwealth,* 870 S.W.2d 219 (Ky.1994) (holding that confession made by defendant following poly-

graph examination was involuntary and thus inadmissible).

In *State v. Bohn,* 950 S.W.2d 277 (Mo.App. 1997), the court ruled that post-polygraph test statements should be excluded—in part because the polygraph examiner rather than the defendant initiated the post-test conversation:

> ... the examiner was a fourteen year veteran of the highway patrol. Before beginning his interview of defendant, he knew that she had consulted an attorney. Following the in-test portion of the polygraph examination, the examiner told her he interpreted the results to show that she was being deceptive. Following some discussion, the examiner said, "Why don't you just talk to the investigators now? I mean, I'm sure they'd be willing to talk to you."

950 S.W.2d at 280.

The prosecution contends in the instant case that the appellant's reported "let's continue" remark constituted a knowing, intelligent, and voluntary waiver, relinquishment, and abandonment of the appellant's right to remain silent and to have the presence and advice of counsel, and rendered anything said during by the appellant during the post-test interrogation admissible.

■ We examine such a claim of relinquishment and abandonment under a "totality of the circumstances" approach. *See* Syllabus Point 1, *State v. Crouch,* 178 W.Va. 221, 358 S.E.2d 782 (1987) states:

> For a recantation of a request for counsel to be effective: (1) the accused must initiate a conversation; and (2) must know-

---

**3.** The prosecution also points to *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994), where we sustained the admission of a confession given after a polygraph test. In that case, however, the defendant had not been arrested, arguably was not in custody, and did not have a lawyer. In *State v. DeWeese,* 213 W.Va. 339, 582 S.E.2d 786 (2003), the defendant, who was in custody, was not given a written *Miranda* warning prior to a polygraph test conducted in his counsel's absence, and statements he made *during* a polygraph test were erroneously used against him at trial. Discussing polygraph tests, we observed that "with the exception of a grand jury proceeding, a criminal defendant has the right to have counsel present in the room where an interroga-

tion is taking place." 213 W.Va. at 348, n. 17, 582 S.E.2d at 798, n. 17. In *DeWeese,* post-test interrogation was not an issue, but we did disapprove of the notion that an earlier *Miranda* warning had such a continuing vitality as to allow later inculpatory statements made during a polygraph test to be admissible. Both *DeWeese* and the instant case point to the potential of polygraph testing in the absence of a defendant's counsel to be the occasion for development of evidence that if admitted at trial may void any subsequent criminal conviction. *See also State v. Chambers,* 194 W.Va. 1, 459 S.E.2d 112 (1995) (evidence regarding polygraph testing and results is inadmissible due to the tests' unreliability).

ingly and intelligently, under the totality of the circumstances, waive his right to counsel.

█ In the instant case, we take into account the following circumstances in deciding whether the appellant initiated a conversation with the police, whether the reported "let's continue" statement should be held to be a knowing and voluntary relinquishment of rights, and whether the statements reported to have been made in the post-test interrogation were admissible.

The appellant was a juvenile, one whose rights are given a higher level of protection and who may be more susceptible to improper influence; the questioning occurred in an area under police control; the appellant was accompanied by counsel to the test but counsel was denied the right to attend the test; neither the appellant nor his counsel was told that a post-test interrogation would occur, even though a post-test interrogation was planned and was initiated by the police after the test; the written waiver form reviewed and signed by counsel and the defendant did not reference any post-test interrogation; the appellant requested consultation with his counsel at the time the post-test interrogation began, but the police did not call the appellant's attorney, although she had left her card with the police; the post-test interrogation was not clearly initiated by the appellant; and there was no written or other contemporaneously recorded waiver by the appellant of the rights to counsel and silence before the post-test interrogation.

█ In Syllabus Point 1 of *State v. Bradley,* 163 W.Va. 148, 255 S.E.2d 356 (1979), this Court stated:

When a criminal defendant requests counsel, it is the duty of those in whose custody he is, to secure counsel within a reasonable time. *In the interim, no interrogation shall be conducted, under any guise or by any artifice.*

(Emphasis added). And in Syllabus Point 3 of *State v. Rissler,* 165 W.Va. 640, 270 S.E.2d 778 (1980), this Court stated:

Once a person under interrogation has exercised the right to remain silent guaranteed by *W.Va. Const.* art. III, section 5, and *U.S. Const.* amend. V, the police must *scrupulously* honor that privilege. The failure to do so renders subsequent statements inadmissible at trial.

(Emphasis added.) This Court adheres fully to these succinct and enduring constitutional principles.

As *Wyrick* teaches, the mere fact that a polygraph test preceded a defendant's inculpatory statements does not itself automatically bar those statements from admission. But *Wyrick* does not mean that a defendant's voluntary waiver of rights in order to take a polygraph test automatically becomes a strategic point where the police, without affirmative notice to a defendant's counsel and under the rubric of a "post-test interview," may conduct an interrogation that would under any other circumstances be utterly unthinkable. *See* note 1, *supra.*

### III.

For the foregoing reasons, we conclude that the circuit court erred in allowing the testimony regarding the defendant's reported statements in the post-polygraph interrogation. The State concedes, and we agree, that if this evidence was erroneously admitted, it was not harmless beyond a reasonable doubt, and therefore the defendant's conviction must be reversed.

The judgment below is therefore reversed and the instant case is remanded for further proceedings consistent with this opinion.[4]

Reversed and Remanded.

---

**4.** In light of our disposition of the instant case, it is not necessary to address the appellant's other assignments of error.