640 S.E.2d 152

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Kevin Ray MIDDLETON, Defendant Below, Appellant.**

**No. 33048.**

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 24, 2006.

Decided: Nov. 29, 2006.

Dissenting Opinion of Justice Starcher Nov. 30, 2006.

Dissenting Opinion of Justice Albright Dec. 11, 2006.

Concurring Opinion of Justice Maynard Jan. 8, 2007.

---

Kathleen T. Pettigrew, Charleston, West Virginia, Herbert L. Hively, II, Hurricane, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Deputy Attorney General, Nicole A. Cofer, Third Year Law Student, Charleston, for Appellee.

DAVIS, Chief Justice.

Kevin Ray Middleton (hereinafter "Mr. Middleton") appeals a final order from the Circuit Court of Kanawha County convicting him of and sentencing him for the crimes of sexual abuse by a parent, custodian or guardian and first degree sexual abuse. Mr. Middleton was sentenced to not less than ten nor more than twenty years imprisonment on the sexual abuse by a parent, custodian or guardian conviction and sentenced to not less than one nor more than five years imprisonment on the first degree sexual abuse conviction. The sentences were to be served consecutively.[1] Here, Mr. Middleton assigns error to (1) the admission of an inculpatory statement he gave to the police; (2) the exclusion of evidence concerning the victim's father; and (3) failure to provide credit to both sentences for presentencing incarceration. After a careful review of the briefs and record, and after listening to the oral arguments of the parties, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

This case resulted because of a telephone conversation Tom W. had with one of his

---

1. A fine was also imposed for each conviction.

daughters, S.W.,[2] on January 14, 2002.[3] During the phone conversation, S.W. informed Tom W. that her mother's boyfriend, Mr. Middleton, had inappropriate sexual contact with her.[4] Tom W. contacted the police and informed them of the allegations. The police subsequently picked up S.W., and her sister, from the home of a babysitter and placed the children with Tom W. Shortly after Tom W. obtained custody of S.W., he took her to a local hospital for an examination. The medical examination revealed no signs of sexual abuse.

On January 15, 2002, Tom W. took S.W. to a local state police detachment for further questioning. While at the detachment, S.W. stated that on separate occasions, Mr. Middleton had touched her vagina with his fingers and an object. Additionally, on January 15, Mr. Middleton voluntarily went to the state police detachment and gave a statement proclaiming his innocence of any sexual contact with S.W. Subsequent to his leaving the detachment, Mr. Middleton was contacted by phone and asked to take a polygraph test. Mr. Middleton agreed to do so.

On January 16, 2002, Mr. Middleton voluntarily returned to the detachment to take a polygraph test. Prior to taking the test, Mr. Middleton executed a document waiving his *Miranda* rights. At the conclusion of the polygraph examination, Mr. Middleton was told that he had failed the test. Subsequent post-polygraph questioning of Mr. Middleton took place for several hours. During the course of the interrogation, an attorney contacted the detachment by phone and stated that he would be representing Mr. Middleton and that the police should not further question Mr. Middleton until he arrived. Mr. Middleton was not informed that the attorney had called.[5] Moreover, Mr. Middleton

alleged that during the interrogation he requested a lawyer.

Near the conclusion of the post-polygraph questioning, Mr. Middleton stated that on one occasion, while sleeping in bed with S.W.'s mother, he accidentally rubbed S.W., who had sneaked onto the bed. He believed that it was her mother that he was rubbing. Mr. Middleton stated that as soon as he realized that he was rubbing S.W. and not her mother, he stopped. After making this statement, Mr. Middleton left the detachment.

Mr. Middleton was arrested approximately two weeks after taking the polygraph test. He was subsequently indicted for sexual abuse by a parent, custodian or guardian and first degree sexual abuse.

Prior to trial, Mr. Middleton filed a motion to suppress the statement he had made to the police regarding his accidental rubbing of S.W. The trial court denied the motion. Mr. Middleton also requested that he be allowed to introduce evidence, through a police officer, that Tom W. had previously filed numerous false police reports against S.W.'s mother, and at least one false report against one of her former boyfriends. The trial court denied introduction of the evidence through a police officer. Thereafter a jury trial followed. Although Mr. Middleton put on a case-in-chief, he did not testify. The jury returned a verdict finding Mr. Middleton guilty of both charges. After sentencing and the denial of post-trial motions, Mr. Middleton filed this appeal.

## II.

### STANDARD OF REVIEW

Mr. Middleton has presented three assignments of error. One of the issues

---

2. Because of the nature of the offenses and the age of the victim, we will refer to the victim by her initials. *See Wilson v. Bernet*, 218 W.Va. 628, 629 n. 3, 625 S.E.2d 706, 707 n. 3 (2005) ("Due to the sensitive nature of the facts regarding the minor child herein, we will adhere to our prior practice in similar cases and use the child's initials rather than full name.").

3. At the time of the conversation, Tom W. was divorced from S.W.'s mother.

4. S.W. was approximately five years old when the crimes occurred. Also, S.W. had a twin sister. No allegations were made against Mr. Middleton regarding S.W.'s twin sister.

5. The record is unclear as to who retained the attorney on behalf of Mr. Middleton.

raised involves the trial court's denial of Mr. Middleton's motion to suppress the incriminating statement he gave to the police. In Syllabus point 3 of *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994), this Court explained the proper standard of review of a trial court's decision on a motion to suppress, as follows:

> On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

*See also* Syl. pt 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996) ("When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.").

■ The second issue raised by Mr. Middleton involves the trial court's exclusion of testimony by a witness. We have held as a general rule that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). *See also State v. Guthrie*, 194 W.Va. 657, 680, 461 S.E.2d 163, 186 (1995) ("[M]ost rulings of a trial court regarding the admission of evidence are reviewed under an abuse of discretion standard.... [A]n appellate court reviews *de novo* the legal analysis underlying a trial court's decision.").

■ The third assignment of error involves the sentence imposed by the circuit

court. As a general rule, "[s]entences imposed by the trial court, if within statutory limits and if not based on some unpermissible factor, are not subject to appellate review." Syl. pt. 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982). However, in cases such as the one before us in which it is alleged that the circuit court has failed to impose a sentence consistent with the law, appellate review is warranted. This Court reviews a circuit court's sentencing decision under an abuse of discretion standard. *See generally* Syl. pt. 1, *State v. Head*, 198 W.Va. 298, 480 S.E.2d 507 (1996).

## III.

## DISCUSSION

On appeal to this Court, Mr. Middleton assigns error to (1) the admission of an inculpatory statement he gave to the police; (2) the exclusion of evidence concerning the victim's father; and (3) failure to provide credit to both sentences for presentencing incarceration.

### A. Admission of an Inculpatory Statement Given to the Police

During the post-polygraph interrogation, Mr. Middleton admitted to accidentally rubbing S.W. when she unexpectedly climbed into bed with him and her mother. Mr. Middleton filed a motion to suppress the statement. The motion was denied, and the statement was presented as evidence during the trial. In this appeal, Mr. Middleton has assigned four reasons as to why the statement should have been suppressed: (1) failure to give *Miranda* warnings, (2) he requested an attorney, (3) failure to inform him that an attorney was representing him, and (4) the statement was involuntary. We shall address each issue separately.

■ **(1) Failure to give *Miranda* warnings.** The record is clear. Mr. Middleton was given his *Miranda* rights prior to taking the polygraph test.[6] This Court has

---

6. Forty years ago, the United States Supreme Court decided the case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

(1966), wherein the Court outlined the requirements for interrogating a suspect:

> Prior to any questioning the person must be warned that he has a right to remain silent,

held that, for the purpose of giving a polygraph test, "*Miranda* warnings must be given to a criminal suspect, *who is in custody,* prior to conducting a polygraph examination." Syl. pt. 2, *State v. DeWeese,* 213 W.Va. 339, 582 S.E.2d 786 (2003) (emphasis added). Mr. Middleton does not contend that he was in custody for the purposes of the polygraph test. Consequently, *Miranda* warnings were not actually required for the limited purpose of taking the polygraph test.[7] However, "[w]here police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins. Absent an effective waiver of these rights, interrogation must cease." Syl. pt. 4, *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995). Mr. Middleton contends that for purposes of the post-polygraph questioning, he was in custody and therefore the police were required to read him his *Miranda* rights and obtain a valid waiver before they interrogated him. The State argues that Mr. Middleton was not in custody during the post-polygraph interrogation and therefore *Miranda* warnings were not required. We agree.

In *State v. Preece,* 181 W.Va. 633, 383 S.E.2d 815 (1989), *overruled on other grounds by State v. Guthrie,* 205 W.Va. 326, 518 S.E.2d 83 (1999), this Court stated, and we now hold, that a trial court's determination of whether a custodial interrogation environment exists for purposes of giving *Miranda* warnings to a suspect is based upon "whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest." 181 W.Va. at 641–642, 383 S.E.2d at 823. *Preece* went on to state, and we also now hold, that:

> The factors to be considered by the trial court in making [a determination of whether a custodial interrogation environment exists], while not all-inclusive, include: the location and length of questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of time between the questioning and formal arrest.

181 W.Va. at 641–642, 383 S.E.2d at 823–824.

In this case, the record shows that the interrogation took place at a state police detachment and that the interrogation lasted several hours.[8] The interrogation involved the suspected sexual abuse of S.W. The evidence at trial showed that not more than two officers interrogated Mr. Middleton at the same time.[9] Although Mr. Middleton argues that the questioning was at times verbally forceful, there was no physical force and no restraints were placed on him.[10] Mr. Mid-

---

that any statement he does make may be used as evidence against him, and that he has a right of the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

384 U.S. at 444–45, 86 S.Ct. at 1612. *Accord* Syl. pt. 7, *State v. Moss,* 180 W.Va. 363, 376 S.E.2d 569 (1988). In the decision of *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980), the United States Supreme Court held "that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *See also* Syl. pt. 8, *State v. Guthrie,* 205 W.Va. 326, 518 S.E.2d 83

(1999) ("The special safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation.").

7. "Advice and information concerning *Miranda* rights will not serve as evidence of an arrest." *State v. Kennedy,* 569 A.2d 4, 8 (R.I.1990).

8. *See State v. Potter,* 197 W.Va. 734, 744, 478 S.E.2d 742, 752 (1996) ("That the questioning took place in a police station is relevant but not controlling.").

9. Mr. Middleton's brief suggests that more than two police officers interrogated him at the same time. However, the evidence in the record does not support this assertion.

10. Mr. Middleton contends that during the interrogation he was told to turn off his cell phone. He also contends that this is evidence of the custodial nature of the interrogation. During the

dleton never stated to the officers that he no longer wished to answer questions.[11] Finally, the questioning occurred on January 16, 2002, while Mr. Middleton was not arrested until January 29, 2002.

Additionally, during the suppression hearing Mr. Middleton stated, in effect, that he wanted to remain at the detachment for further questioning after the polygraph test:

Q. Why didn't you leave after the test?

A. I was still willing to try to prove my innocence-well, I wished I could, you know, that's what I was wanting to do. I didn't want to make it look like, well, I'm guilty, I'm leaving, you know.

At the end of the post-polygraph interrogation, Mr. Middleton was allowed to leave the detachment.

Taking all of the above factors into consideration, we do not believe that Mr. Middleton was in custody during the post-polygraph interrogation. Consequently, there was no requirement that the police inform Mr. Middleton of his *Miranda* rights before or during the post-polygraph interrogation. *See State v. Potter*, 197 W.Va. 734, 478 S.E.2d 742 (1996) (finding defendant not in custody

after voluntarily going to police station to be questioned); *State v. Honaker*, 193 W.Va. 51, 454 S.E.2d 96 (1994) (same).[12]

Our decision on this issue is supported by the astute observations of Justice Cleckley in *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994). The facts of *Farley* illustrate that, during a two-month period, a number of suspicious fires occurred in Mannington, West Virginia. The local police asked a number of suspects, including the defendant, to come to the police station to take a polygraph test. The defendant agreed and voluntarily went to the police station. Prior to giving the defendant the polygraph test, the police read the defendant his *Miranda* rights. The defendant signed a waiver form and was given the test. After the test the defendant was told that he did not perform well on the test. Three police officers began questioning the defendant, without providing post-polygraph *Miranda* warnings. The defendant ultimately confessed to the crimes on which he was eventually indicted. One of the issues raised by the defendant on appeal was that the confession should have been suppressed because he invoked his rights under *Miranda*

suppression hearing an officer testified that it is customary to require cell phones be turned off "so it doesn't interfere with the exam."

Mr. Middleton also argued that the custodial nature of the interrogation was evident by the fact that his cell phone was eventually taken from him. The record shows that the cell phone was taken because Mr. Middleton's girlfriend, S.W.'s mother, had arrived at the detachment and asked the police to retrieve the cell phone from Mr. Middleton.

**11.** As discussed later in the opinion, Mr. Middlteon alleged that at some point during the interrogation he stated that he needed a lawyer.

**12.** *See also Johnson v. State*, 673 So.2d 796 (Ala. Cr.App.1995) (finding defendant was not in custody at time he voluntarily went to police station for questioning, so as to require *Miranda* warnings); *Betts v. State*, 799 P.2d 325 (Alaska Ct. App.1990) (same); *State v. Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995) (same); *People v. Stansbury*, 9 Cal.4th 824, 38 Cal.Rptr.2d 394, 889 P.2d 588 (1995) (same); *State v. Lapointe*, 237 Conn. 694, 678 A.2d 942 (1996) (same); *Brown v. State*, 658 So.2d 1166 (Fla.Dist.Ct.App.1995) (same); *State v. Walker*, 204 Ga.App. 1, 418 S.E.2d 384 (1992) (same); *State v. Sugimoto*, 62 Haw. 259, 614 P.2d 386 (1980) (same); *State v. Birkla*, 126

Idaho 498, 887 P.2d 43 (1994) (same); *People v. Asteri*, 196 Ill.App.3d 885, 144 Ill.Dec. 20, 554 N.E.2d 1059 (1990) (same); *Sevion v. State*, 620 N.E.2d 736 (Ind.Ct.App.1993) (same); *State v. Jones*, 246 Kan. 214, 787 P.2d 726 (1990) (same); *State v. Jackson*, 362 So.2d 1082 (La.1978) (same); *State v. Glenner*, 513 A.2d 1361 (Me. 1986) (same); *Commonwealth v. Jung*, 420 Mass. 675, 651 N.E.2d 1211 (1995) (same); *People v. Wasson*, 31 Mich.App. 638, 188 N.W.2d 55 (1971) (same); *State v. Isa*, 850 S.W.2d 876 (Mo. 1993) (same); *State v. Rorvik*, 224 Mont. 104, 728 P.2d 419, 421 (1986) (same); *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995) (same); *State v. Marshall*, 148 N.J. 89, 690 A.2d 1 (1997) (same); *People v. Pristell*, 204 A.D.2d 801, 612 N.Y.S.2d 253 (1994) (same); *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747, 755 (1995) (same); *State v. Biros*, 78 Ohio St.3d 426, 678 N.E.2d 891 (1997) (same); *State v. Hickam*, 71 Or.App. 471, 692 P.2d 672 (1984) (same); *Commonwealth v. Schoellhammer*, 308 Pa.Super. 360, 454 A.2d 576 (1982) (same); *State v. Diaz*, 654 A.2d 1195 (R.I.1995) (same); *State v. Neeley*, 271 S.C. 33, 244 S.E.2d 522 (1978) (same); *State v. Jenner*, 451 N.W.2d 710 (S.D.1990) (same); *State v. Bush*, 942 S.W.2d 489 (Tenn.1997) (same); *Kiser v. State*, 788 S.W.2d 909 (Tex.App.1990) (same); *State v. Shuman*, 639 P.2d 155 (Utah 1981) (same); *Pruett v. Commonwealth*, 232 Va. 266, 351 S.E.2d 1 (1986) (same).

to remain silent. Justice Cleckley rejected the contention and concluded that the defendant did not affirmatively assert his right to remain silent. More importantly for purposes of the instant case, prior to addressing the issue raised in *Farley*, Justice Cleckley set out the following in a footnote:

> There is a serious question whether the *Miranda* rights are even applicable in this case. The facts indicate that the defendant was not in custody while the interrogation took place. . . . Because neither the parties nor the trial court addressed this issue and because the defendant was actually advised of his *Miranda* rights at the time he was [given the polygraph test], we too will assume that the full panoply of *Miranda* rights apply to this interrogation.

*Farley*, 192 W.Va. at 254 n. 10, 452 S.E.2d at 57 n. 10. In the instant case, we do not have to *assume* that the "panoply of *Miranda*" rights apply. Unlike the situation in *Farley*, the State has in fact argued that the defendant was not in custody when he was questioned by the police. Therefore, as was suggested by *Farley*, *Miranda* warnings did not have to be given to Mr. Middleton because he was not in custody when the police questioned him. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) ("[The] police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "); *Commonwealth v. Schoellhammer*, 308 Pa.Super. 360, 454 A.2d 576, 580 (1982) ("It is clear that appellant was a focus of the investigation at the time of the polygraph examination; however, without some further indicia of custody accompanying the administration of polygraph tests, *Miranda* warnings are not required.").

■ (2) **Requesting an attorney.** Mr. Middleton testified at the suppression hearing that at some point during the interrogation he stated, "I need a lawyer." The officers called by the State during the suppression hearing testified that Mr. Middleton did not make any statement requesting a lawyer. The trial court found that Mr. Middleton's testimony on this issue was not credible.

■ The law is clear in holding that "[w]hen a criminal defendant requests counsel, it is the duty of those in whose custody he is, to secure counsel within a reasonable time. In the interim, no interrogation shall be conducted, under any guise or by any artifice." Syl. pt. 1, *State v. Bradley*, 163 W.Va. 148, 255 S.E.2d 356 (1979). *See also Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S.Ct. 486, 488, 112 L.Ed.2d 489 (1990) ("[T]he police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel."); *State v. Bradshaw*, 193 W.Va. 519, 528, 457 S.E.2d 456, 465 (1995) ("[O]nce a defendant invokes his right to an attorney under *Miranda*, the defendant must reinitiate contact in order for the authorities to resume interrogation."). Under *Bradley*, if a person is in custody and requests counsel, no interrogation may take place. In the instant case we have already determined that Mr. Middleton was not in custody. Therefore, assuming for the sake of argument, that Mr. Middleton did in fact state that he needed a lawyer, such a statement did not invoke the protections of *Miranda* so as preclude further questioning by the police. This precise issue was addressed by Justice Cleckley in *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995).

In *Bradshaw*, the defendant was convicted in two separate trials of second and first degree murder. One of the issues raised in the consolidated appeal of the convictions was that the trial court erred in admitting the defendant's confession. The defendant contended that the confession was given during an interrogation in which he requested counsel. Justice Cleckley found that at the time of the confession the defendant was not in custody; therefore the request for counsel did not prevent the police from questioning him further. The opinion addressed this issue as follows:

> [T]he *Miranda* right to counsel has no applicability outside the context of custodi-

al interrogation. Therefore, until the defendant was taken into custody, any effort on his part to invoke his *Miranda* rights was, legally speaking, an empty gesture. We believe the "window of opportunity" for the assertion of *Miranda* rights comes into existence only when that right is available. . . . To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value. . . .

Our refusal to extend the *Miranda* . . . protections to noncustodial interrogation is consistent with the goals of *Miranda,* which allow the police to conduct effective criminal investigations and at the same time provide a defendant an opportunity to dissipate [the inherent compulsion that is brought about by the combination of custody and interrogation]. . . .

*Bradshaw,* 193 W.Va. at 530, 457 S.E.2d at 467 (internal quotations and citations omitted) (footnotes omitted). *See also United States v. Lennick,* 917 F.2d 974, 978 (7th Cir.1990) ("As discussed above, [defendant] was never in custody. Therefore, his statement that he 'had an attorney who wanted to be present at any questioning concerning the rifle' did not require agent Allbritten to stop his inquiry."); *State v. Stanley,* 167 Ariz. 519, 809 P.2d 944, 950 (1991) ("[E]ven though a suspect invokes his right to decline further interrogation until he has spoken to a lawyer, the police may continue to question him in a non-custodial setting."); *People v. Goyer,* 265 Ill.App.3d 160, 202 Ill.Dec. 744, 638 N.E.2d 390, 396 (1994) ("Because defendant was not in custody, his statement regarding an attorney, even if considered a clear and unequivocal request, does not implicate any constitutionally protected right, and the officers were consequently not required to end the interview."); *Kelley v. State,* 825 N.E.2d 420, 430 (Ind.Ct.App.2005) ("Assuming that [defendant] made the request to speak to an attorney, his right to counsel had not accrued because he was not in custody. Thus, the interview need not have stopped when the request was made and the admission of the evidence is not precluded."); *Hunt v. State,* 687 So.2d 1154, 1160 (Miss.1996) ("[I]f [de-

fendant's] first alleged request for an attorney took place in a non-custodial setting, her . . . right to counsel was not implicated."); *State v. Daughtry,* 340 N.C. 488, 459 S.E.2d 747, 755 (1995) ("[D]efendant was not in custody when he requested an attorney; thus, *Miranda* . . . d[id] not apply."); Syl. pt. 2, *State v. Fry,* 61 Ohio App.3d 689, 573 N.E.2d 1108 (1988) ("A police officer may continue to question a suspect in a noncustodial situation, even if the suspect has made a request for counsel, so long as the officer's persistence in questioning does not render statements made by the suspect involuntary."); *State v. Kramer,* 720 N.W.2d 459, 463 (Wis.Ct.App.2006) ("[U]nless a defendant is in custody, he or she may not invoke the right to counsel under *Miranda.*").

Based upon the foregoing authority, we now hold that a police officer may continue to question a suspect in a noncustodial setting, even though the suspect made a request for counsel during the interrogation, so as long as the officer's continued questioning does not render statements made by the suspect involuntary. *See* Syl. pt. 3, *Bradshaw* ("To the extent that any of our prior cases could be read to allow a defendant to invoke his *Miranda* rights outside the context of custodial interrogation, the decisions are no longer of precedential value.").

Mr. Middleton cites to this Court's decision in *State v. Jones,* 216 W.Va. 392, 607 S.E.2d 498 (2004) (per curiam), to support his argument that further questioning should have ceased when he purportedly stated that he needed a lawyer. *Jones* is clearly distinguishable from the facts of this case.

In *Jones,* the defendant, a juvenile charged as an adult with two counts of second degree murder, had been arrested and was presumably out on bond when he agreed to take a polygraph test. The defendant was accompanied to the polygraph test by his counsel. However, at some point his lawyer left. After the polygraph test concluded, the police questioned the defendant. The defendant requested consultation with his counsel, but the police did not contact the defendant's attorney. The defendant subsequently made incriminating statements that were intro-

duced at trial, and the defendant was convicted. On appeal, this Court reversed the convictions because the police continued to question the defendant after he had requested to speak with his lawyer.

One of the critical factors present in *Jones,* and not present in the instant case, was the fact that the defendant had been arrested at the time the police interrogated him. Indeed, in order to reverse the convictions in *Jones,* we had to distinguish our decision in *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994), "where we sustained the admission of a confession given after a polygraph test. In that case, however, the defendant had not been arrested, arguably was not in custody, and did not have a lawyer." Insofar as Mr. Middleton was not in custody when he made the alleged statement that he needed a lawyer, the police were not precluded from further questioning.

**(3) Failure to inform Mr. Middleton that an attorney represented him.** On the day of the interrogation, an attorney contacted the police and informed them that he represented Mr. Middleton. The attorney further advised the police that Mr. Middleton should not be questioned before the attorney arrived.[13] The police did not convey this information to Mr. Middleton. Here, Mr. Middleton contends that under this Court's decision in *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985), he had a right to be informed that counsel had been retained on his behalf. We disagree.

The issue of advising a suspect that counsel represents him or her was addressed by this Court in Syllabus point 1 of *Hickman* as follows:

A defendant who is being held for *custodial interrogation* must be advised, in addition to the *Miranda* rights, that counsel has been retained or appointed to represent him where the law enforcement officials involved have knowledge of the attorney's retention or appointment. This rule is based on the theory that without this information, a defendant cannot be said to have voluntarily and intelligently waived his right to counsel.

(Emphasis added). Under its express terms, *Hickman* may only be invoked when a suspect is the subject of "custodial interrogation." Insofar as we have determined that Mr. Middleton was not in custody, *Hickman* did not require the police to inform him that an attorney had been retained for him.

The State contends that we should not extend the requirement of *Hickman* to noncustodial interrogations in view of the decision by the United States Supreme Court in *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). We agree.

In *Moran,* the defendant was convicted of and sentenced for murder by the State of Rhode Island. After the conviction and sentence were sustained on direct appeal, the defendant filed a habeas corpus petition in a federal district court. In the habeas petition, the defendant alleged that his rights under *Miranda* had been violated because the police failed to inform him, during "custodial interrogation," that counsel had been retained on his behalf. The federal district court denied relief. However, a federal court of appeals found that the defendant's *Miranda* rights were violated by the failure of the police to inform him that counsel had been retained to represent him. The State of Rhode Island appealed this decision to the United States Supreme Court. The Supreme Court rejected the decision of the appellate court. In doing so, the opinion reasoned as follows:

[W]e [are not] prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him. While such a rule might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption. . . . We have little doubt that the approach urged by respondent and endorsed by the Court of Appeals would have the inevitable consequence of muddying *Miranda*'s otherwise relatively clear waters. The legal questions it would spawn are legion: To what extent should the police be held accountable for knowing

---

13. The evidence below is unclear as to who retained the attorney for Mr. Middleton. It was asserted that either Mr. Middleton's girlfriend or his employer retained the attorney for him.

that the accused has counsel? Is it enough that someone in the station house knows, or must the interrogating officer himself know of counsel's efforts to contact the suspect? Do counsel's efforts to talk to the suspect concerning one criminal investigation trigger the obligation to inform the defendant before interrogation may proceed on a wholly separate matter? We are unwilling to modify *Miranda* in a manner that would so clearly undermine the decision's central virtue of informing police and prosecutors with specificity ... what they may do in conducting [a] custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible....

. . . .

We acknowledge that a number of state courts have reached a contrary conclusion.... Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law. We hold only that the Court of Appeals erred in construing the Fifth Amendment to the Federal Constitution to require the exclusion of respondent's three confessions.

*Moran,* 475 U.S. at 425–428, 106 S.Ct. at 1143–1144 (internal quotations and citations omitted).

 Contrary to the rule adopted in *Hickman,* which was decided before *Moran,* the decision in *Moran* makes clear that *Miranda* is not violated because the police fail to inform a suspect under "custodial interrogation" that counsel was retained for him or her. Insofar as we have determined that Mr. Middleton was not in custody during the interrogation, we need not decide today whether *Hickman* should remain good law in

light of *Moran.*[14] It is enough for the resolution of this case for this Court to hold that if, during the course of noncustodial interrogation of a suspect, the police are made aware that legal counsel has been retained for the suspect, the police are under no obligation to inform the suspect that counsel has been retained.

In view of *Moran* and our holding herein, Mr. Middleton's rights under *Miranda* were not violated as a result of the failure of the police to inform him that counsel had been retained on his behalf.[15]

 **(4) Voluntariness of statement.** The final issue raised by Mr. Middleton on this point is that the incriminating statement he made to the police was not given voluntarily. We have held that "[t]he State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case." Syl. pt. 5, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975). In Syllabus point 2 of *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995), we held that "[w]hether an extrajudicial inculpatory statement is voluntary or the result of coercive police activity is a legal question to be determined from a review of the totality of the circumstances." Ultimately, this issue boils down to whether or not the incriminating statement "was freely and voluntarily made, without threats or intimidation, or some promise or benefit held out to the accused." *State v. Singleton,* 218 W.Va. 180, 184, 624 S.E.2d 527, 531 (2005) (citation omitted).

 In the instant case, Mr. Middleton testified at the suppression hearing that

14. It should be noted that in *State v. Hager,* 204 W.Va. 28, 511 S.E.2d 139 (1998), this Court was faced squarely with the question of whether *Hickman* should be overruled in light of *Moran.* However, the opinion refrained from taking up the issue because it was determined that counsel had not been retained for the defendant at the time of his custodial interrogation. *Hager* did stress, "however, the significance of the *Moran* decision and its guidance should such situation arise." *Hager,* 204 W.Va. at 39, 511 S.E.2d at 150.

15. Mr. Middleton does not argue that the police should have ceased the interrogation because of the attorney's request. *See Roman v. State,* 475 So.2d 1228, 1233 (Fla.1985) ("As for appellant's argument regarding his right to counsel, the question is whether police officers questioning a suspect in a noncustodial setting must comply with an attorney's request that they cease questioning the suspect[.] We think not.").

the police promised to obtain a light sentence for him if he confessed, and that an officer knocked his hat off of his head. The State presented the testimony of several officers involved with the interrogation. The officers testified that no promises or threats were made to Mr. Middleton. Mr. Middleton was told that he was not under arrest. Mr. Middleton was told that he was free to leave. The trial court found the officers' testimony to be credible. This Court has previously noted that "where credibility was the sole issue in a suppression hearing, we [will] not conclude that a judge abused his discretion in holding a confession [or statement] admissible." *State v. Wilson*, 170 W.Va. 443, 445, 294 S.E.2d 296, 298 (1982). The reason for this is that "[i]t is the role of the [factfinder], and not a court on appeal . . ., to determine the credibility of witnesses." *State ex rel. Corbin v. Haines*, 218 W.Va. 315, 322, 624 S.E.2d 752, 759 (2005). *See State v. Guthrie*, 173 W.Va. 290, 295, 315 S.E.2d 397, 402 (1984) ("The trial judge heard the testimony and was in the best position to evaluate the credibility of witnesses.").

 In essence, Mr. Middleton submitted to the post-polygraph interrogation because he "was still willing to try to prove [his] innocence[.]" Even so, in seeking to show that the statement was involuntary, Mr. Middleton relies heavily upon the fact that the interrogation lasted for about five hours. However, "[i]t is axiomatic that prolonged [interrogation] by itself does not establish coercive police conduct." *Bradshaw*, 193 W.Va. at 534, 457 S.E.2d at 471 (confession not involuntary because of six-hour interrogation). In order to show coercion because of the length of the interrogation, Mr. Middleton needed to point to facts in the record establishing that the "questioning adversely affected him or that he had special mental or physical conditions the police exploited to force [the statement from him]." *Bradshaw*,

193 W.Va. at 535, 457 S.E.2d at 472. Nothing in the record of this case supports finding coercion because of the length of the interrogation. There was testimony during the suppression hearing that Mr. Middleton was allowed to go outside to smoke a cigarette, and that he was provided "with drinks and bathroom breaks, and stuff like that." *See Bradshaw*, 193 W.Va. at 535, 457 S.E.2d at 472 ("[T]here were breaks in the questioning and the police officers did not deprive the defendant of any necessities.").

After examining the totality of the circumstances involved with the interrogation, we find that there was sufficient evidence in the record to support finding that Mr. Middleton's statement was voluntary.

### B. Exclusion of Evidence Concerning the Victim's Father

 The next issue raised by Mr. Middleton involves a ruling by the circuit court that prevented him from asking questions of a witness regarding the alleged past conduct of the victim's father, Tom W. Specifically, during Mr. Middleton's case-in-chief he was prepared to call Officer Scott Duff of the Jefferson Police Department. According to the proffer by Mr. Middleton, Officer Duff would have testified that "[Tom W.] filed numerous false police reports against [Mrs. W.] (S.W.'s mother) regarding the children, and on at least one occasion also against a previous boyfriend of [Mrs. W]." The circuit court ruled that Mr. Middleton would not be allowed to ask Officer Duff questions about reports filed by Tom W. because Tom W. did not testify and he was not the complaining victim in the case.[16]

 Mr. Middleton contends that exclusion of the proffered testimony by Officer Duff denied him his constitutional right to confront witnesses against him. This Court has explained that "[t]he Sixth Amendment to the United States Constitution and Section

**16.** Mr. Middleton's brief erroneously asserts that the circuit court held that even if Tom W. testified, Mr. Middleton could not ask Tom W. questions about filing prior police reports. The circuit court made no such ruling. The circuit court ruled that if Tom W. testified, Mr. Middleton could ask him: "Did you make this report or that report to the police, and did it turn out

badly, or did it pan out[.]" The circuit court pointed out that Mr. Middleton "would be stuck with his answer . . . You can't attack that extrinsically."

Additionally, the record indicates that neither the State nor Mr. Middleton listed Tom W. as a witness on their respective witness lists.

14 of Article III of the West Virginia Constitution guarantee an accused the right to confront and cross-examine witnesses."[17] *State v. Mason*, 194 W.Va. 221, 227, 460 S.E.2d 36, 42 (1995), *overruled on other grounds by State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). *See also State v. Eye*, 177 W.Va. 671, 673, 355 S.E.2d 921, 923 (1987) ("The confrontation clause of the Sixth Amendment to the United States Constitution, coupled with the Fourteenth Amendment, guarantees the right of an accused in a criminal prosecution to confront the witnesses against him."). In *Mason* this Court noted that "[t]he Confrontation Clause provides a defendant with two distinct forms of protection: '[T]he right physically to face those who testify against him, and the right to conduct cross-examination.'" *Mason*, 194 W.Va. at 227 n. 7, 460 S.E.2d at 42 n. 7 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40, 53 (1987)). The protections afforded by the Confrontation Clause are not without limits. Trial courts have "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 678–679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

 We need not dwell on the Confrontation Clause issue. The protections offered by the Confrontation Clause simply do not extend to give Mr. Middleton the right to call a witness to testify adversely about a person who was not the complaining victim and who did not testify. In other words, "'the constitution does not require confrontation of witnesses with irrelevant evidence[.]'" *State v. Quinn*, 200 W.Va. 432, 440 n. 13, 490 S.E.2d 34, 42 n. 13 (1997) (quoting *Roundtree v. United States*, 581 A.2d 315, 321 (D.C. 1990)). Moreover, it has been held that "[t]he clause emphatically does not confer upon criminal defendants a right to present any and all relevant substantive evidence in their case in chief." *Jones v. Goodwin*, 982 F.2d 464, 469 (11th Cir.1993). In the final analysis, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985).

While it is true that Tom W. reported the sexual abuse to the police, the State prosecuted this case on behalf of S.W., not her father. Whether or not Tom W. had evil motives in having S.W. talk to the police was wholly irrelevant. For the purposes of the prosecution, S.W. was the complaining victim, not Tom W.[18] Additionally, as pointed out, Tom W. did not testify at the trial. Consequently, the trial court did not abuse its discretion in excluding the proffered testimony of Officer Duff.

### C. Failure to Provide Credit to Both Sentences for Presentence Incarceration

 The final issue raised by Mr. Middleton involves the proper distribution of

---

17. The Confrontation Clause contained in the Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall ... be confronted with the witnesses against him[.]" The Confrontation Clause contained in the West Virginia Constitution, Section 14 of Article III, provides that in "[t]rials of crimes, and misdemeanors ... the accused shall be ... confronted with the witness against him[.]"

18. Mr. Middleton also argues that a police officer called by the State testified that Tom W. reported the sexual abuse allegations to the police. It is Mr. Middleton's position that such a statement was hearsay, and, consequently Rule 806 of the West Virginia Rules of Evidence permitted him to attack Tom W.'s credibility. We disagree. Rule 806 generally allows a party to attack the credibility of the declarant of a hearsay statement. However, the police officer's statement that Tom W. reported the abuse was not hearsay. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial ..., offered in evidence to prove the truth of the matter asserted." Insofar as "the statement[ ] w[as] admitted not to prove the truth of the matter asserted but rather to show why the [police investigated] the incident, the statement[ ] w[as] not hearsay by definition." *State v. Pettrey*, 209 W.Va. 449, 456, 549 S.E.2d 323, 330 (2001). *See also State v. Dennis*, 216 W.Va. 331, 350, 607 S.E.2d 437, 456 (2004) ("As the officer simply testified to what he heard ... and what he did as a result of what he heard, we find no hearsay let alone error.").

credit for the time that he was incarcerated prior to sentencing.[19] Mr. Middleton served 185 days in jail prior to sentencing. The trial court's sentencing order states that Mr. Middleton would be given full credit for presentence incarceration under the sentence for sexual abuse by a parent, custodian or guardian conviction. In this appeal, Mr. Middleton contends that the 185 days should also be allocated to the sentence he received on the first degree sexual abuse conviction.[20] The State contends, and we agree, that "[t]he time served credit applies to the total effective sentence, not separately to each component of the sentence." *See Commonwealth v. Merigris*, 452 Pa.Super. 78, 681 A.2d 194, 195 (1996) ("This court does not deal in 'volume discounts.' The operative rule ... is that a defendant should receive credit only once for time served before sentencing.").

In Syllabus point 1 of *Martin v. Leverette*, 161 W.Va. 547, 244 S.E.2d 39 (1978), this Court held that "[t]he Double Jeopardy and Equal Protection Clauses of the West Virginia Constitution require that credit for time spent in jail, either pre-trial or post-trial, shall be credited on an indeterminate sentence where the underlying offense is bailable." In *State ex rel. Roach v. Dietrick*, 185 W.Va. 23, 404 S.E.2d 415 (1991), we explained the reasoning for requiring a defendant to be given credit for presentence incarceration:

> Constitutional protections are implicated because a person who is unable to make bail will be incarcerated before trial. If such person is not given credit for the jail

time, a longer period of incarceration will occur than for the person who commits the same offense but is released on pretrial bail.

*Roach*, 185 W.Va. at 25 n. 5, 404 S.E.2d at 417 n. 5.

In order to resolve the issue presented by Mr. Middleton, we must first examine the tension that exists between two prior decisions of this Court. Thereafter, we must resolve that tension.

**1. Tension existing in two prior decisions.** This Court has issued two opinions addressing the issue of crediting presentence confinement time to consecutive sentences. As will be shown, the two cases, *Echard v. Holland*, 177 W.Va. 138, 351 S.E.2d 51 (1986), and *State v. Scott*, 214 W.Va. 1, 585 S.E.2d 1 (2003), may be interpreted as conflicting each other.

██ The first opportunity this Court had to address the issue of allocating presentencing jail time to consecutive sentences occurred in *Echard v. Holland*, 177 W.Va. 138, 351 S.E.2d 51 (1986). In *Echard*, the defendant was convicted and sentenced separately for crimes committed in Wood County and Ritchie County. The Wood County sentencing order required the sentences be served consecutively. After the defendant began serving the sentences, he filed a habeas corpus petition seeking to obtain release on the grounds that prison officials had failed to properly calculate his "good time" credit.[21] The issue of credit for presentence jail time was not actually raised by the defendant.

---

**19.** It will be noted that the record does not show that Mr. Middleton challenged the sentencing decision while the case was pending before the circuit court. We have held that "[a]s a general matter, a defendant may not assign as error, for the first time on direct appeal, an issue that could have been presented initially for review by the trial court on a post-trial motion." Syl. pt. 2, *State v. Salmons*, 203 W.Va. 561, 509 S.E.2d 842 (1998). However, it was also said in *Salmons* that "[w]hen a defendant assigns an error in a criminal case for the first time on direct appeal, the state does not object to the assignment of error and actually briefs the matter, and the record is adequately developed on the issue, this Court may, in its discretion, review the merits of the assignment of error." Syl. pt. 3, *Salmons*. In this proceeding the State has not objected to

the sentencing issue being raised apparently for the first time in this appeal, and has in fact briefed the issue. Consequently, we will address the merits of the issue.

**20.** This issue was poorly briefed by Mr. Middleton and he failed to cite to any authority supporting the relief he seeks. We cannot discern from the brief exactly how he wanted the presentence incarceration time credit to be applied to his first degree sexual abuse conviction, *i.e.*, apportioned or outright complete duplication.

**21.** "[T]he accumulation of good time is dependent upon the prisoner's behavior or 'good conduct' while incarcerated." *State ex rel. Gordon v. McBride*, 218 W.Va. 745, 749, 630 S.E.2d 55, 59 (2006).

However, in reviewing the record, this Court found that prison officials improperly deducted good time credit and presentencing jail time credit from both sentences. This Court stated the following with respect to allocating "good time" and "presentence jail time" to consecutive sentences:

> The maximum terms of the consecutive sentences, determinate or indeterminate, must first be added together to determine the inmate's maximum discharge date. It is from this maximum discharge date that *all presentence* and good time deductions must be made in order to establish the inmate's minimum discharge date.

*Echard,* 177 W.Va. at 143, 351 S.E.2d at 56–57 (emphasis added). The ruling in *Echard,* that presentence jail time is to be allocated to the maximum sentence of consecutive sentences, stood unchallenged until the majority decision in *State v. Scott,* 214 W.Va. 1, 585 S.E.2d 1 (2003) (Davis, J., dissented in an opinion in which Maynard, J., joined).

In *Scott,* the defendant pled guilty to uttering and to transporting drugs into a jail.[22] The defendant was sentenced to one to ten years on the uttering conviction, and one to five years on the second conviction. The sentences were ordered to be served consecutively. However, because of the defendant's youthful age, the sentences were suspended, and the defendant was placed in the rehabilitation program at the Anthony Correctional Center. After spending over a year at the Anthony Center, the defendant was released and placed on probation. The defendant eventually violated probation and was ordered to serve his previously suspended consecutive sentences. The order committing the defendant to prison also granted him credit for the time spent confined at the Anthony Center and for the time he was briefly incarcerated after each of his two arrests, which amounted to a total of 567 days. The trial court's order required 565 days of the previous confinement be credited toward the uttering charge and only two days credited toward the drug transportation charge.[23] Further, the order imposed the credit for time served on the maximum term of each sentence.

The defendant in *Scott* appealed the sentencing order and argued that the credit for time served should have been apportioned between the two consecutive sentences imposed by the circuit court, and that the credit for time served should be deducted from the minimum terms of incarceration, not the maximum. In addressing the issues raised by the defendant, the majority opinion placed them in the context of whether credit for time served at the Anthony Center should be allocated any differently than if a defendant had not been confined to the Anthony Center. In doing so, the majority held the following in Syllabus point 6 of the opinion:

> Where a criminal defendant has been placed on probation after successfully completing a program of rehabilitation at a young adult offender center under the Youthful Offenders Act, W. Va.Code, 25–4–1 to –12, and such probation is subsequently revoked, pursuant to W. Va.Code, 25–4–6 [2001] the circuit court's sentencing order must credit the defendant with time spent in incarceration in such a manner that the defendant's date of eligibility for parole is the same as if the defendant had not been committed to a young adult offender center and subsequently placed on probation.

Further, footnote 11 of the majority opinion stated, "[t]he simplest way to correct the order might be to allocate 365 days toward the first, uttering count, and the remaining 202 days toward the transporting count." *Scott,* 214 W.Va. at 9 n. 11, 585 S.E.2d at 9 n. 11.

The dissenters in *Scott* argued that the majority opinion was inconsistent with controlling law and that the majority opinion attempted to overrule existing law through a footnote. The dissenters addressed the issues as follows:

> Unfortunately, the majority opinion has attempted to overrule *Echard* without ac-

---

**22.** The crimes were committed on different occasions, but resolved together.

**23.** The trial court credited two days for the drug transportation conviction because the defendant had spent two days in jail after he was arrested on that charge.

knowledging that fact. The majority opinion, at first blush, appears to apply only to defendants who are initially placed at a youthful offender center. A closer look reveals that the opinion is not limited to that situation. This is true because, under Syllabus point 6 of the majority opinion, a defendant placed at such a center must be awarded time served "as if the defendant had not been committed to a young adult offender center." In other words, such a defendant must be granted time served in the same manner as any other defendant with presentence time served. However, the syllabus point fails to explain exactly how credit for time served should be awarded. This is where the Court's prior decision in *Echard* should have been applied. Instead, however, the majority opinion chose to elaborate on the application of its syllabus point in footnote 11. This was improper for two reasons. First, footnote 11 does not follow the rule announced in *Echard*, and is, therefore, simply wrong. Second, by providing instruction to the bar that is contrary to the existing law in this state, the majority has attempted to create new law in a footnote. A footnote is not the proper place to announce new law. " '[N]ew points of law ... will be articulated through syllabus points as required by our state constitution.' Syllabus Point 2, in part, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001)." Syl. pt. 13, *State ex rel. Medical Assurance of West Virginia v. Recht*, 213 W.Va. 457, 583 S.E.2d 80 (2003). Furthermore, we have explained "language in a footnote generally should be considered obiter dicta which, by definition, is language 'unnecessary to the decision in the case and therefore not precedential.' " *Id.*, 213 W.Va. at 471, 583 S.E.2d at 94 (quoting Black's Law Dictionary 1100 (7th ed.1999)).

The least of the problems caused by the majority opinion will be appeals challenging the manner in which circuit courts apportion presentence time served. The greater problem will arise from defendants being released far too early from prison because of the imposition of credit for time served on the minimum terms of consecutive sentences.

*Scott*, 214 W.Va. at 10–11, 585 S.E.2d at 10–11.

**2. Resolving the tension between *Echard* and *Scott*.** As pointed out by the dissenters, the decision in *Scott* did not expressly overrule *Echard*. As a consequence, *Scott* left our law in limbo with respect to crediting presentence time for consecutive sentences. For the reasons that follow, we make clear today that, to the extent that *Scott* may be interpreted as permitting apportionment or outright duplication of credit for presentencing jail time, and allocation of presentence jail time credit to the minimum terms of consecutive sentences, we disapprove of any such interpretation.

 We begin by examining the statute relevant to the issue raised by Mr. Middleton, which provides the following:

Whenever any person is convicted of an offense in a court of this State having jurisdiction thereof, and sentenced to confinement in jail or the penitentiary of this State, or by a [magistrate court] having jurisdiction of the offense, such person may, in the discretion of the court or justice, be given credit on any sentence imposed by such court or [magistrate] for the term of confinement spent in jail awaiting such trial and conviction.

W. Va.Code § 61–11–24 (1923) (Repl.Vol. 2005).[24] It is clear that the above statute is silent as to how credit for presentencing jail time is to be allocated when sentences are required to run consecutively. This Court has indicated that "[w]hen a statute is silent on such an important factor, we look to the overarching design to glean the legislative intent for [the] statute." *West Virginia Human Rights Comm'n v. Garretson*, 196 W.Va. 118, 127, 468 S.E.2d 733, 742 (1996). We have also held that "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of

---

**24.** Our prior decisions have modified the statute to the extent that it gives a trial court discretion to refuse to award a defendant credit for presentence jail time. *See Martin v. Leverette*, 161 W.Va. 547, 244 S.E.2d 39 (1978).

the enactments." Syl. pt. 3, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). *See also* Syl. pt. 5, in part, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975) ("Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent."). In carrying out this task we are mindful that:

> A statute should be read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syl. pt. 3, *Buda v. Town of Masontown*, 217 W.Va. 284, 617 S.E.2d 831 (2005) (quoting Syl. pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908)). We believe that the Legislature intended to harmonize the allocation of credit for presentence jail time under W. Va.Code § 61–11–24 with the allocation of good time credit under W. Va.Code § 28–5–27 (1984) (Repl.Vol.2004). *See Stanley v. Department of Tax and Revenue*, 217 W.Va. 65, 71, 614 S.E.2d 712, 718 (2005) ("[T]his Court must generally apply, when and where feasible, the principle of the harmonization of statutes[.]").

W. Va.Code § 28–5–27(c) provides that "[e]ach inmate committed to the custody of the commissioner of corrections ... shall be granted one day good time for each day he or she is incarcerated, *including any and all days in jail awaiting sentence* and which is credited by the sentencing court to his or her sentence pursuant to [W. Va.Code § 61–11–24]." (Emphasis added). It is further provided under W. Va.Code § 28–5–27(e) that "[a]n inmate under two or more consecutive sentences shall be allowed good time as if the several sentences, when the maximum terms thereof are added together, were all one sentence."

It is clear that under W. Va.Code § 28–5–27 good time credit may be earned while serving a prison sentence and while in jail awaiting sentencing. Furthermore, under this statute, when a defendant is given consecutive sentences, good time credit is not allocated to each sentence. It is applied to the aggregate of the maximum sentences as though they were one. We believe that the Legislature intended for the allocation of credit for "presentence jail time" to be consistent with the manner in which "good time" credit is allocated.[25] This is the conclusion that *Echard* reached. Moreover, we note that "courts of other jurisdictions ... have uniformly held that, when consecutive sentences are imposed for two or more offenses, periods of presentence incarceration may be credited only against the aggregate of all terms imposed[.]" *Endell v. Johnson*, 738 P.2d 769, 771 (Alaska Ct.App.1987). *Accord State v. Cuen*, 158 Ariz. 86, 761 P.2d 160, 161 (1988); *Schubert v. People*, 698 P.2d 788, 795 (Colo.1985); *Barnishin v. State*, 927 So.2d 68, 71 (Fla.Dist.Ct.App.2006); *State v. Taui-*

---

**25.** If we did not harmonize the disposition of good time credit and credit for presentence incarceration, the following absurdity occurs. A defendant would have his/her "good time" earned during "presentence incarceration" allocated to the aggregate maximum term of consecutive sentences, as required by W. Va.Code § 28–5–27; while the "actual" presentence incarceration time would be apportioned between the minimum confinement periods of consecutive sentences, as implicitly suggested by *Scott*. We do not believe the Legislature intended to have presentence incarceration "good time" and presentence "actual time served" allocated in such an irrational manner. Moreover, as pointed out by

the dissenters in *Scott*, allocating "actual" presentence incarceration time to the minimum terms of consecutive sentences would allow many defendants to be eligible for parole before they have served a full day in prison. Clearly the Legislature did not intend these results. *See* Syl. pt. 2, *Newhart v. Pennybacker*, 120 W.Va. 774, 200 S.E. 350 (1938) ("Where a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made."); *Coal & Coke Ry. Co. v. Conley*, 67 W.Va. 129, 178, 67 S.E. 613, 634 (1910) ("It is the duty of a court so to construe a statute as to avoid absurd and inconsistent results, if possible.").

*liili*, 96 Hawai'i 195, 29 P.3d 914, 918 (2001); *State v. Hoch*, 102 Idaho 351, 630 P.2d 143, 144 (1981); *People v. Latona*, 184 Ill.2d 260, 234 Ill.Dec. 801, 703 N.E.2d 901, 907 (1998); *Payne v. State*, 838 N.E.2d 503, 510 (Ind.Ct. App.2005); *Commonwealth v. Carter*, 10 Mass.App.Ct. 618, 411 N.E.2d 184, 186 (1980); *People v. Watts*, 186 Mich.App. 686, 464 N.W.2d 715, 716 (1991); *State v. Anderson*, 520 N.W.2d 184, 187 (Minn.Ct. App.1994); *State v. Riley*, 761 S.W.2d 745, 746 (Mo.Ct.App.1988); *State v. Sanchez*, 2 Neb.App. 1008, 520 N.W.2d 33, 36 (1994); *State v. Decker*, 127 N.H. 468, 503 A.2d 796, 797 (1985); *State v. Miranda*, 108 N.M. 789, 779 P.2d 976, 979 (1989); *Nissel v. Pearce*, 307 Or. 102, 764 P.2d 224, 228 (1988); *State v. Richardson*, 295 N.C. 309, 245 S.E.2d 754, 760–761 (1978); *State v. Arcand*, 403 N.W.2d 23, 24 (N.D.1987); *State v. Percy*, 158 Vt. 410, 612 A.2d 1119, 1127 (1992); *State v. Wolfe*, 242 Wis.2d 426, 625 N.W.2d 655, 657 (2001).

■ In view of the foregoing, we hold that, consistent with our decision in *Echard v. Holland*, 177 W.Va. 138, 351 S.E.2d 51 (1986), when a trial court awards credit for presentence incarceration to a defendant receiving consecutive sentences, the period of presentence incarceration must be credited against the aggregated maximum term of the consecutive sentences. To the extent that language in the decision of *State v. Scott*, 214 W.Va. 1, 585 S.E.2d 1 (2003), suggests a different allocation of presentence credit to consecutive sentences, it is disapproved.

■ In the instant proceeding, Mr. Middleton received consecutive sentences often to twenty years and one to five years.

Thus, the effective sentence was eleven to twenty-five years. Mr. Middleton was credited with serving 185 days in jail while awaiting sentence. The 185 days is applied against the twenty-five year maximum. Although the trial court set out the credit for presentence incarceration directly to the sentence for ten to twenty years, we find no error because the ultimate result is the same for purposes of determining the maximum discharge date. Consequently, we find no error in the sentencing disposition.[26]

## IV.

### CONCLUSION

We affirm the circuit court's order convicting and sentencing Mr. Middleton for sexual abuse by a parent, custodian or guardian and first degree sexual abuse.

Affirmed.

STARCHER, J., dissenting.

The majority opinion is a meandering foray that laboriously navigates a number of jurisprudential seas. Such laboriousness, string citing, the dropping of estimable jurisprudential names, etc. alerts the reader to the oft-combined strategies of numbing and bolstering, in the service of concealing a moral and legal flaw.

Here, the moral and legal nugget to be jurisprudentially shrouded and clouded is the fact that *the police deliberately concealed* from this suspect the fact that he had a lawyer and that the lawyer had demanded that the suspect be advised not to say anything.

---

**26.** In Mr. Middleton's *reply brief*, he argues for the first time that the consecutive sentences violate the proportionality rule. *See* Syl. pt. 7, *State v. Vance*, 164 W.Va. 216, 262 S.E.2d 423 (1980) ("A criminal sentence may be so long as to violate the proportionality principle implicit in the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution."). It has been recognized that "[t]his Court has no rule that precludes addressing the merits of an issue properly raised in a reply brief." *Verizon West Virginia, Inc. v. West Virginia Bureau of Employment Programs, Workers' Comp. Div.*, 214 W.Va. 95, 126, 586 S.E.2d 170, 201 (2003) (Davis, J., dissenting). However, "[o]ur general rule is that nonjurisdictional ques-

tions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999). *See also State v. Dennis*, 216 W.Va. 331, 350, 607 S.E.2d 437, 456 (2004) ("Errors assigned for the first time on appeal will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court had objection been raised there."). Insofar as this nonjurisdictional issue was raised for the first time in the *reply brief*, the State was not provided an opportunity to respond to the issue. Consequently, we decline to address the issue in this appeal.

The majority opinion's ruling is that if the police can colorably claim that a person is not "in custody," it's okay for the police to lie about what a person's lawyer has told the police. Bob Dylan wrote in "Hurricane," "It makes you feel ashamed, to live in a land where justice is a game." I feel the same way about the majority opinion.

There are dozens of people who have been freed from death row by DNA evidence who gave an incriminating statement to the police. Where a person is in an incommunicado [1] state—like this defendant was—many people will eventually say what the police want to hear.

In the instant case, the defendant's statement in question probably had little to do with his conviction. The majority is willing to overlook egregious and shameful misconduct by the police because it appears that the defendant is guilty and the majority is unwilling to put the state (and the victim) through another trial. I sympathize with this position, and I might be willing to treat the admission of the statement as harmless error. But I am not willing to go along with allowing the police to lie to suspects and lawyers, and to keep suspects incommunicado.

Accordingly, I dissent.

ALBRIGHT, Justice, dissenting.

In this case the majority has fashioned two new points of law from which I vigorously dissent. They read as follows:

3. A police officer may continue to question a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation, so long as the officer's continued questioning does not render statements made by the suspect involuntary.

4. If, during the course of noncustodial interrogation of a suspect, the police are made aware that legal counsel has been retained for the suspect, the police are under no obligation to inform the suspect that counsel has been retained.

I briefly outline some of the basic principles underlying my concerns. As first established in the United States Supreme Court case of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), a person has the right to counsel in the criminal context anytime he or she is taken into custody and interrogated by the police. In reaching this decision, the Court in *Escobedo* considered the government's argument that the number of confessions police obtained during custodial interrogations would likely decrease if the right to counsel extended to custodial interrogations. The Court concluded in *Escobedo* that:

> no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights.... If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.

*Id.* at 490, 84 S.Ct. 1758. The decision in *Escobedo* reflects that the Court struck the balance of these competing interests in favor of individual rights by reducing coercion inherent in custodial interrogation. Custodial interrogation was then subsequently defined by the high court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to be that point when a suspect who is undergoing police questioning is in "custody or *otherwise deprived of ... freedom of action in any significant way.*" *Id.* at 444, 86 S.Ct. 1602 (emphasis added).

The majority solves most of the issues regarding the admissibility of Appellant's statement to police by finding that he was not in custody and ignoring the facts that strongly suggest or outright prove that Appellant was being subjected to a custodial interrogation, as defined in *Miranda.* There is clear indicia that Appellant was deprived of freedom of action in *most* significant ways. The police ignored Appellant's expressed desire for counsel and refused to inform Appellant that counsel had been retained to assist

---

1. The police refused to tell him of his lawyer's communication. They would not let him have his cell phone on. This is being incommunicado.

him. Additionally, Appellant was the only suspect in this case, he was being questioned at the state police detachment, he had been informed that he failed the polygraph test, he was not permitted to have his cell phone turned on during the interrogation and the police questioning went on for five hours. While Appellant may not have been in custody at the onset of the interrogation, the cumulative factors present in this case clearly demonstrate that the circumstances changed during the course of the questioning and Appellant was indeed involved in a custodial interrogation. At that nebulous point when the interrogation became custodial, the police were required not only to again advise Appellant of his constitutional rights but also -and I believe more importantly—to respect those rights when Appellant asserted them. Under the circumstances of this case, that respect should have been shown by stopping the questioning, telling Appellant that a lawyer had been retained and allowing Appellant to talk with a lawyer. It defies common sense to claim that Appellant was not deprived of freedom of action in very significant respects.

The "noncustodial interrogation" determination also was used by the majority to avoid finding that the police officers were required to inform Appellant of the retention of the lawyer as decided previously by this Court in *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985). Instead, the majority, at the State's suggestion, adopts a conclusion reached in the United States Supreme Court case of *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), refusing to apply our existing state law. By its discussion of *Moran* and *Hickman*, the majority inappropriately and improvidently raised some doubt about the validity of *Hickman* but did not overrule it

It is clear by the terms of the *Moran* decision that the several states are not bound to follow its course. "Nothing in the [United States] Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right

or privilege." 475 U.S. at 425, 106 S.Ct. 1135. As a matter of fact, the Court later in *Moran* acknowledged

> that a number of state courts have reached a contrary conclusion. We recognize also that our interpretation of the Federal Constitution, if given the dissent's expansive gloss, is at odds with the policy recommendations embodied in the American Bar Association Standards of Criminal Justice. Notwithstanding the dissent's protestations, however, our interpretive duties go well beyond deferring to the numerical preponderance of lower court decisions or to the subconstitutional recommendations of even so esteemed a body as the American Bar Association. Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law. We hold only that the Court of Appeals erred in construing the Fifth Amendment to the Federal Constitution to require the exclusion of respondent's three confessions.

Id. at 427–28, 106 S.Ct. 1135 (internal citations omitted). Footnote ten of Justice Stevens' dissent in *Moran* cites the cases from a significant number of states which had already reached a contrary conclusion. *Id.* at 439–40. Additionally, as predicted, several states have since recognized the holding in *Moran* but have found that their state constitutions require broader protection for their citizens on either or both self-incrimination principles or due process grounds. *See e.g. State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988); *Bryan v. State*, 571 A.2d 170 (Del.Supr.1990); *People v. McCauley*, 163 Ill.2d 414, 206 Ill.Dec. 671, 645 N.E.2d 923 (1994); *West v. Cmmw.*, 887 S.W.2d 338 (1994); *Com. v. Mavredakis*, 430 Mass. 848, 725 N.E.2d 169 (2000); *People v. Bender*, 452 Mich. 594, 551 N.W.2d 71 (1996); *State v. Roache*, 148 N.H. 45, 803 A.2d 572 (2002); *State v. Reed*, 133 N.J. 237, 627 A.2d 630 (1993).

This case presents an instance where the due process [1] and self-incrimination [2] provi-

---

**1.** *See* W.Va. Const. art. III, § 10 ("No person shall be deprived of life, liberty, or property, without due process of law . . . .")

**2.** See W.Va. Const. art. III, § 5 ("No person shall . . ., in any criminal case, be compelled to be a witness against himself. . . .")

sions of the West Virginia Constitution should "require higher standards of protection than afforded by the Federal Constitution" in keeping with the long-standing jurisprudence of our state. Syl. Pt. 1, *State v. Bonham*, 173 W.Va. 416, 317 S.E.2d 501 (1984). Requiring police to advise a person that an attorney has been retained to represent that person, and granting a lawyer who has been retained admission to an interrogation site to talk with the person being interrogated promotes the justice and fairness that is and should be an inherent part of our justice system. As Justice Stevens observed in his dissent in *Moran*, "[t]he recognition that ours is an accusatorial, and not an inquisitorial system ... requires that the government's actions, even in responding to ... brutal crime, respect those liberties and rights that distinguish this society from most others." 475 U.S. at 436, 106 S.Ct. 1135.

The final major concern I address here involves the majority's discussion of the voluntariness of the statement in question. In its examination of this issue, the majority defers to the lower court's determination that the state met its burden of proving that the statement was given voluntarily based on the testimony taken at the suppression hearing. Even the majority felt compelled to qualify its holding in syllabus point three to note that continued interrogation after a request for counsel has been made may render the questioning involuntary. This qualification simply points out that the majority's holding in this new syllabus point is likely to generate more, not less, litigation where access to legal counsel is unfairly denied a suspect. Of course, the deck will often be stacked against a defendant in such cases because the suspect, having been kept in isolation and otherwise held incommunicado, will be the only witness on his own behalf, whereas the State will often have several officers to refute any suggestion that anything that was said or done during the questioning rendered the statements involuntary. From this standpoint, the new point of law set forth as syllabus point three has little meaning and even less protection to a person who voluntarily complies with a police investigation. It certainly provides no incentive to cooperate with law enforcement investigations and will

probably result in fewer confessions under these circumstances, as well as serve to promote litigation of custody issues in cases where confessions are obtained.

In sum, I fear there will be untoward consequences which will emanate from this decision. It may produce less public cooperation in investigations and conceivably fewer useable confessions obtained by law enforcement, and perhaps some manipulative and secretive tactics by police. I believe the people of this state expected a better interpretation of the protections afforded our citizens by Article III of our West Virginia Constitution than was rendered in the majority opinion in this case. Accordingly, I dissent.

MAYNARD, Justice, concurring.

In this case the majority opinion has affirmed Mr. Middleton's convictions and sentences for sexually abusing a five year old girl. I fully embrace the majority's reasoning and ultimate decision. I write separately only for the purpose of responding to some points raised in the dissenting opinions.

To begin, Justice Albright takes the position that Mr. Middleton was in custody during the post-polygraph questioning. The problem with Justice Albright's position is that no evidence was found in the record to show that Mr. Middleton was in custody. In fact, Justice Albright's dissenting opinion acknowledges this fact. His dissenting opinion states the following regarding the evidence of custodial interrogation:

> While Appellant may not have been in custody at the onset of the interrogation, the cumulative factors present in this case clearly demonstrate that the circumstances changed during the course of the questioning and Appellant was indeed involved in a custodial interrogation. At that nebulous point when the interrogation became custodial, the police were required not only to again advise Appellant of his constitutional rights but also—and I believe more importantly—to respect those rights when Appellant asserted them.

Nowhere in Justice Albright's dissenting opinion does he identify the "cumulative fac-

tors" that demonstrate the "nebulous point" when the interrogation became custodial. Simply put, you "cannot make a silk purse out of a sow's ear. As we review a case, we are, for better or worse, confined to the record before us." *Rosa S. v. Superior Court*, 100 Cal.App.4th 1181, 122 Cal.Rptr.2d 866, 870 (2002). The record in this case was simply devoid of any evidence to show that Mr. Middleton was in custody. The glaring absence of such evidence in Justice Albright's dissenting opinion supports the majority's determination that Mr. Middleton was not in custody during the post-polygraph testing.

Justice Albright also suggests that because Mr. Middleton was a suspect the protections of *Miranda* were applicable. This position is inconsistent with well-settled law. The United States Supreme Court "decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). Indeed, "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings[.]" *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984). *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."). In the final analysis, the position taken by Justice Albright would have this Court apply Miranda protections to both custodial and noncustodial interrogations. Such a position is inconsistent with *Miranda*.

Finally, both dissenters take issue with the majority opinion's conclusion that "[i]f, during the course of noncustodial interrogation of a suspect, the police are made aware that legal counsel has been retained for the suspect, the police are under no obligation to inform the suspect that counsel has been retained." As pointed out by the Ohio Supreme Court, "[t]he United States Supreme Court has rejected any per se requirement that 'the police inform a suspect of an attorney's efforts to reach him.'" *State v. Williams*, 99 Ohio St.3d 439, 793 N.E.2d 446, 459 (2003) (quoting *Moran v. Burbine*, 475 U.S. 412, 425, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). *See also Ex parte Neelley*, 494 So.2d 697, 699 (Ala.1986) ("[N]either petitioner's Fifth nor Sixth Amendment rights were violated by the failure of the interrogating authorities ... to inform her of the presence of an attorney who had been sent at the request of a third party."); *Mitchell v. State*, 306 Ark. 464, 816 S.W.2d 566, 568 (1991) ("During appellant's interrogation, counsel repeatedly telephoned the sheriff's department attempting to gain information about appellant's case. The police never told appellant of counsel's efforts. When counsel failed to contact appellant, counsel instructed the police to cease questioning of appellant. The police ignored counsel's instructions.... [A]ppellant did not know of counsel's efforts on his behalf. Consequently, we find that the police treatment of counsel is irrelevant to the validity of appellant's waiver."); *Ajabu v. State*, 693 N.E.2d 921, 927 (Ind.1998) ("[N]either the Fifth Amendment nor the Fourteenth Amendment guarantee of due process is violated by admission of a confession obtained after an attorney, unknown to the suspect, unsuccessfully seeks to intervene in an interrogation."); *Lodowski v. State*, 307 Md. 233, 513 A.2d 299, 304 (1986) ("[W]e now hold that the waiver of the rights was not rendered ineffective under the Fifth Amendment by the failure of the police to inform [defendant] that counsel had been employed to represent him and were attempting to consult with him."); *Terrell v. State*, 891 S.W.2d 307, 311 (Tex.App.1995) ("Sgt. Gafford ... refused to interrupt the interview of Appellant to advise him that [counsel] was present and available to talk with him....

The record reflects that Appellant independently decided to forgo the advice of counsel and did not invoke that right even though he had been represented by [counsel] in the past and allegedly considered him to be the family attorney. The record supports a finding that Appellant knowingly, voluntarily, and intelligently waived his right to counsel."); *State v. Bradford,* 95 Wash.App. 935, 978 P.2d 534, 539–540 (1999) ("[U]nder the holdings in *Burbine* and *Earls,* police need not tell an accused of the presence of an attorney immediately available to counsel them."). Insofar as the United States Supreme Court and courts of other jurisdictions do not require the police to inform a suspect that an attorney represents him/her, the majority opinion reached the correct and legally sound result.[1]

Based upon the foregoing, I respectfully concur.

1. Contrary to suggestions by Justice Albright, the majority's decision does not disturb the requirement under *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985), that police inform a suspect under "custodial interrogation" that legal counsel has been retained for the suspect. The majority opinion stated in clear terms that "we need not decide today whether *Hickman* should remain good law [.]"